**FEE PAID**

FILED

2023 MAR 10  PM 12: 47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___ **rsm** ___

**S/I**

Firpo Wycoff Carr
info@firpocarr.com
4067 Hardwick Street, #330
Lakewood, California 90712
(513) 764-6224
Plaintiff in Pro Per

**United States District Court**
**Central District of California**

2:23-CV-01813-ODW-MAAx

| | |
|---|---|
| FIRPO WYCOFF CARR,<br>                    Plaintiff<br><br>                    vs<br><br>FEDERAL BUREAU OF INVESTI-<br>GATION; AND UNITED STATES<br>DEPARTMENT OF JUSTICE<br>                    Defendant | Case No.: _____<br><br>COMPLAINT FOR DAMAGES<br>PURSUANT TO 10 U.S. Code § 921;<br>Title 18, U.S.C., Section 241;<br>18 U.S. Code § 2261A<br><br>DEMAND FOR JURY TRIAL |

### I. Jurisdiction

1. This court has jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction arises pursuant to 10 U.S. Code § 921; Title 18, U.S.C., Section 241; 18 U.S. Code § 2261A.

### II. Venue

2. Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this complaint happened in this district.

### III. Parties

3. Plaintiff Firpo Wycoff Carr, 4067 Hardwick Street, #330, Lakewood, California 90712.

1

CV-126 (09/09)                 PLEADING PAGE FOR A COMPLAINT

4.  Defendant Federal Bureau of Investigation, Los Angeles Field Office, 11000 Wilshire Boulevard, Suite 1700, Los Angeles, California 90024.

5.  Defendant U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; Central District of California, 312 North Spring Street, Los Angeles, California 90012.

### IV.  Statement of Facts

6.  On November 26, 2022, between 6:00 and 6:30 p.m., an undercover Special Agent from the Federal Bureau of Investigation (FBI), Los Angeles Field Office, working under the auspices of a Foreign Intelligence Surveillance Act of 1978 (FISA) warrant of which Plaintiff (a law-abiding African American male, age 68 with no criminal record), who is suspected of being a spy for a foreign government, is the subject, posed as a person experiencing homelessness and, exceeding his authority, stole the following items from Plaintiff when Plaintiff momentarily stepped away from the table he sat at while dining at Panera Bread restaurant, 11300 South Street, Cerritos, California 90703: one laptop computer, a Microsoft Surface Pro4, a Samsung A32-5G android phone (number ending in 8440), a Samsung Tab A computer tablet, a set of HyperX headphones, and a beige satchel. Ultimately, the Special Agent worked with others, including, quite probably, the manager on duty at the time. FBI Cyber Operations teams have tracked Plaintiff's online activity and have interfered or otherwise tampered with

2

and intercepted Plaintiff's innocuous email transactions for years, wherever he goes, including his job at the University of Phoenix, Southern California Campus, Ontario Learning Center on Wednesday, March 1, 2023, where Plaintiff detected and took a cell phone photo of their WIFI network, "FBI Cyber Ops Tm6[7]." [See Exhibit 1.]

7. Plaintiff is well qualified to recognize aspects of the FBI's covert *illegal* operations attributable to the fact that he attended two weeks (80 hours) of intensive training in the Los Angeles Police Department (LAPD) Detective School (March 13, 2000 – March 24, 2000) where he learned *legal* tactics used by the FBI, as well as courses in Terrorism Awareness. Plaintiff's further familiarity with FBI tactics is evidenced by his training and certification on the California Law Enforcement Telecommunications System (CLETS), a computer network primarily maintained by the FBI that gives police departments access to national databases. Also, Plaintiff's computer training includes being trained and certified on the FBI's National Crime Information Center (NCIC) computerized database. The FBI's website reads regarding this center: "NCIC has operated under a shared management concept between the Federal Bureau of Investigation (FBI) and state and federal criminal justice users since its inception. The FBI provides a host-computer and telecommunication network to the control terminal agency in each of the 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam,

3

and Canada, as well as federal criminal justice agencies." (FBI — The FBI's National Crime Information Center). Furthermore, Plaintiff attended mandatory training to become familiar with the FBI's Criminal Justice Information Services (CJIS). Their website reads: "The FBI's Criminal Justice Information Services Division, or CJIS, is a high-tech hub in the hills of West Virginia that provides a range of state of-the-art tools and services to law enforcement, national security and intelligence community partners, and the general public." (Criminal Justice Information Services (CJIS) — FBI). With his cumulative knowledge and experience, Plaintiff knows that the FBI is intent on using its sophisticated cyber operations to harass and intimidate him.

8.  At about 6:00 p.m. on November 26, 2022, Plaintiff dined at an empty Panera Bread, given that it was the Thanksgiving Day weekend, as he worked on revising his latest book, *Modern Matthew: Good News for Today—College Edition*. As a regular customer, Plaintiff pays a monthly subscription as a member of Panera Bread's "Sip Club," which allowed him to have a virtually endless supply of hot and cold beverages. After a server who was mutually familiar with Plaintiff was cleaning tables and assured him that she would watch his items. At the same time, he went a few doors down to Kabuki Japanese Restaurant for takeout. Plaintiff left Panera Bread for approximately ten minutes. As he walked back to Panera, he noticed the server speaking with a woman sitting in a car to pick

4

up her Panera Bread order. The woman asked Plaintiff if the items at the now

empty table were his. After answering in the affirmative, she stated that a White

male on a skateboard had just scooped them up and skated away in a specific

direction. Plaintiff dropped his food and ran in that direction but found no one

fitting the woman's description.

9.  After attempting to locate the thief, Plaintiff returned to Panera Bread.

The server apologized profusely and said that her manager, Sonya, called her

away, which left my belongings vulnerable to theft. She said it all happened so fast

and that she was gone for no more than 30 seconds. She also stated that she noticed

a suspicious-looking white male walking around outside the full glass windows

near the table where Plaintiff was sitting and that he would leave momentarily

when he saw her eyeing him and then return. Plaintiff asked the server to write

down a description of the thief, which she did, using an available felt-tipped pen

and two pieces of scratch paper [see Exhibit 2 and Exhibit 3].

10.  Still reeling from the incident, Plaintiff composed himself enough to

return to his office nine miles away, retrieve his second cell phone, a Samsung

A10e with a number ending in 6224, to call the Los Angeles County Sheriff's

Department (LASD) in Cerritos, California, and report the crime [see Exhibit 4].

Plaintiff considered it curious that Sonya, the manager, asked him if she could take

a photograph of this document, which he allowed. As a psychologist using his

5

experience as a former detective-trained Assistant-Officer-In-Charge (AOIC) with the LAPD, who trained detectives on LAPD's Detective Case Tracking System (DCTS), Plaintiff was able to ascertain that it was the FBI who stole his items.

11. Fighting to keep his composure, Plaintiff sensed that the precise timing of his being away from his table, the server being conveniently called away, and the actual theft of said items were more than coincidental. It seemed like an orchestrated effort, especially since Sonya, the manager, was cavalier, smug, insensitive, and defiant about Plaintiff's tremendous loss. Three months later, Plaintiff learned that Deputy Mutum, the deputy sent to take the report, reached a similar conclusion. He wrote in his Incident Report: "I spoke with the store manager (Sonya fh/adult nfd) and asked if her surveillance camera's [sic] captured the crime, to which she replied, 'Yea but you'll need a court subpoena to view it' as she grinned at me, as if she was proud.'" [See Exhibit 5.] Plaintiff believes that the FBI coordinated with Sonya, which would make her an accomplice to conspiracy and larceny if true, by having one agent call her from a vehicle nearby to have her summon the server away from Plaintiff's table, which afforded the second agent, posing as "a random homeless man," to confiscate Plaintiff items post haste. With the full backing of her FBI collaborators, Sonya, who at 5 feet 4 inches weighs 110 pounds, was emboldened to disrespectfully—nay, sarcastically—stand up to a mere LASD deputy with 15 years of service.

6

12. Significantly, Plaintiff's training, education, and travels are at the heart of and factor largely into the FBI's motivation to steal said items. Such background is presented forthwith:

13. Since the screen on the Surface Pro4 was unlocked, once in their possession, FBI agents then deleted Plaintiff's files after no doubt copying them in an effort to find incriminating evidence against him, given that he has traveled to over 80 countries, territories, and islands from 1987 to 2019 in his work as a researcher in religious and social studies. Plaintiff has been a university instructor of comparative religions for 30 years and has conducted research studies in surgical and medical procedures relative to the bloodless treatment for Jehovah's Witnesses. Plaintiff is also a seminary-trained ordained minister and has membership in the American College of Surgeons (ACS), American Psychological Association (APA), and American Medical Association (AMA).

14. Among the countries Plaintiff has traveled to in conducting research are China, the Soviet Union, and Cuba, all of which happened to have a capricious relationship with the U.S. and which justifiably prompted red flags in the FBI's system.

15. China: After touring India to study Hinduism, Buddhism, Jainism, and Sikhism firsthand, Plaintiff made one of his three trips to China for an up close and personal look at Confucianism and Daoism. Plaintiff had taught these Eastern

7

religion courses—as well as Judaism, Christianity, and Islam—at the start of his

career as a university instructor.  Given that tension between the U.S. and China

has intensified in recent years, the FBI capitalized on Plaintiff's trips there as an

opportunity to frame him for spying for the Chinese. This became evident in email

exchanges between Plaintiff and Dr. Don K. Nakayama, a fellow American

College of Surgeons (ACS) member and editor of the journal *The American*

*Surgeon*.

16.  On December 13, 2022, at 10:43 p.m., Plaintiff wrote the following

email: "Dear Dr. Don K. Nakayama, I hope this email finds you well. I am hoping

that you can send me a copy of the manuscript # ASU-22-0636 entitled 'Surgeon

Anxiety and Jehovah's Witnesses: Effective Intervention—A Pilot Study,' which I

submitted to *The American Surgeon*. I am no longer in possession of the file since

both my primary and backup laptops were stolen.  Thank you for your time, sir.

Kind regards, Firpo Carr, PhD."

17.  On December 14a, 2022, at 10:24 a.m. Plaintiff wrote the following

email: "Dear Dr. Don K. Nakayama, I have received the manuscript that I

requested. In her due diligence, Jessica sent it posthaste as per your direction.

Thank you very much. Although I presented an updated, more robust version of the

manuscript via a PowerPoint presentation at Clinical Congress 2022 this past

8

October, it is beneficial to retain the original. Thank you again for your time and
consideration, sir. Kind regards, Firpo."

18. On December 14b, 2022, at 12:07 p.m., Plaintiff received the following
email, allegedly from Dr. Don K. Nakayama: "Thank you. Remember there is a
limit of four figures and tables. – DKN." [See Exhibit 6.]. The brief, suspicious,
nonsensical email appears to be spoofed. The email profile photograph of Dr.
Nakayama [see Exhibit 7], who is Japanese American [see Exhibit 8], appears to
be deep fake or photoshopped to make him appear to be a Communist Chinese
military official wearing the traditional military hat [see Exhibit 9].

19. On December 14c, 2022, at 1:01 p.m., Plaintiff sent the following email
to his alternate email address, firpocarr@firpocarr.com: "Someone has spoofed this
reply email and photo of Japanese surgeon  Dr. Don K. Nakayama to make him
appear to be a member of the Communist Chinese government. This is an apparent
attempt to tie me to the Chinese government. At [sic] it is, I have no ties
whatsoever to either the Chinese government or to, any communist government, or
any country or nation that the U.S. is an enemy." As far as Plaintiff knows, there is
not now nor has there ever been an online photo of Dr. Nakayama in Communist
Chinese military apparel. A stressed Plaintiff concluded that it is improbable that
such a sophisticated stratagem to paint Dr. Nakayama as a Communist Chinese

9

military official and tie him to Plaintiff would be employed by "a random homeless man" who is desirous of framing Plaintiff for espionage.

20. <u>Soviet Union</u>: Moreover, after assisting the Soviets in modernizing the catalog at what was then called the Saltykov Shchedrin State Public Library during his travel to the Soviet Union, January 1 – 14, 1989, the Soviets declared Plaintiff their "Special Guest." They then allowed Plaintiff to take, for the first time, color photographs of pages from the world's oldest, most complete Hebrew Bible (Old Testament), the Codex Leningrad B19a. This newsworthy event captured the attention of various news organizations, including the *Los Angeles Times* (August 4, 1990, "Southern California File," by John Dart, Religious Writer) and *Biblical Archaeology Review* (September/October 1992, Vol. 18, No. 5, "Firpo W. Carr Was First").

21. <u>Cuba</u>: Additionally, when Plaintiff was unexpectedly invited to travel to Cuba in 2002 by a friend ("Willie") of a friend ("Lucy") who was a travel agent, President Fidel Castro arranged for Plaintiff to present his findings on racism in the dictionary on state-run national television. Plaintiff had read and studied *Webster's Ninth New Collegiate Dictionary* in 1994 and subsequently documented the astonishing, consistent thread of anti-Black racism in his book *Wicked Words: Poisoned Minds—Racism in the Dictionary* (1997). After Lucy told her Cuban sponsor of the book, its existence eventually reached the ears of President Castro.

10

Plaintiff was unaware that his findings would appeal to the communist leader and had no idea that Castro would invite him to speak to the Cuban people.

22.  That Plaintiff traveled to the Soviet Union to study biblical manuscripts and to Cuba to study the socio-cultural dynamic when juxtaposed with life in America was undoubtedly at the core of a FISA judge's decision to grant a FISA warrant wherein Plaintiff is subject. However, Plaintiff is convinced that it was not the *intent* of the FISA judge to grant the FBI permission to break the law. More specifically, Plaintiff also feels that his visits to these countries notwithstanding, the FISA judge's decision does not give the FBI a license to find Plaintiff guilty of espionage against the United States of America, especially provided that, until the present, the U.S. still permits travel to these destinations. In short, the FBI has conspired to injure Plaintiff, to procure him to be charged or arrested for espionage.

23.  Plaintiff purchased a new laptop computer from Best Buy, 12118 Lakewood Blvd., Downey, California, on November 27, 2022, the next day after the FBI theft. Having been an instructor at the University of Phoenix (UOPX) who has taught computer-related and other courses for nearly 30 years, Plaintiff attempted to access his two backup cloud drives (One Drive by the University of Phoenix and his personal Google Drive) in hopes of retrieving his files. Plaintiff reasoned that a random "homeless man" would be either satisfied or thrilled with

11

the money he hoped to receive from the computers he stole and would neither likely have the know-how to reach files on cloud drives nor have any use for said files. To Plaintiff's great disappointment, virtually all files going back years on these cloud drives had been deleted.

24. The FBI obtained Plaintiff's passwords from his hard drives and deleted files, pictures, PowerPoint slides, and video presentations. Desperately hoping for a miracle to verify that he was not overlooking any files, Plaintiff contacted UOPX Faculty Technical Support in hopes of locating files in some nook and cranny in cyberspace. Disappointingly he was told that essentially all files had indeed been deleted, which was a highly unusual, deliberate act. Though crestfallen, this troubling information strengthened Plaintiff's suspicions that deleting his files in the backup cloud drives was nefarious. He surmised that this was not the work of a random, highly skilled technological whiz of a man living on the street. Moreover, no attempt was made to access Plaintiff's bank accounts or steal his identity. Instead, the perpetrators wanted to obtain Plaintiff's invaluable, innocuous information in his computer files and deny Plaintiff access.

25. In the face of all odds, Plaintiff took an even deeper dive into where the files were, resting heavily on his substantive training over the decades. To bolster his confidence and escape depression, Plaintiff reminded himself that with a Ph.D. in computer information systems, a master's degree in management, and a

12

bachelor's degree in information systems management, all acquired during his ten years (1979 – 1989) of employment with International Business Machines (IBM), he could find something that perhaps UOPX Technical Support may have missed.

26.  Furthermore, as clearer thinking repositioned the trauma that the FBI theft caused, Plaintiff began to gather himself as he revisited his qualifications. He mused that he worked as a civilian for the LAPD from 1994 – 2004, primarily as a Systems Analyst II, but also as an Assistant-Officer-in-Charge (AOIC) with the rank equivalency of sergeant.

27.  As a Systems Analyst II, Plaintiff specialized in cybercrime. Because of his computer proficiency, Plaintiff was subpoenaed as an expert witness for the LAPD and appeared before Judge Lance Ito in 2002. Judge Ito had presided over the O.J. Simpson murder trial in 1995, and his wife, Margret York, was the first woman to be promoted to the rank of Deputy Chief in the LAPD in 2000, during the time Plaintiff was with the LAPD. Being immersed in the totality of this law-enforcement culture facilitated Plaintiff's perception of the FBI's illegal actions, which further heightened his stress.

28.  Plaintiff's reassessment led to a breakthrough. He was pleased to find the United States Patent and Trademark Office (USPTO) file correspondence and information related to his trademark issuance and patent application in a cloud drive that the FBI and UOPX Faculty Support missed. His excitement, however,

13

was short-lived. When he attempted to open the files, he discovered that each one had been systematically corrupted sophisticatedly, as indicated by a small peach-colored square in the lower left of the file icon, whether an Adobe in a Portable Document Format (.pdf) or Microsoft Word file. Plaintiff took a photograph of the screen displaying the files. [See Exhibit 10]. To Plaintiff's consternation, these cloud drive files have since mysteriously disappeared, a feat that the FBI's cyber operations no doubt easily performed.

29.  Starting with the act of larceny, the following chronological presentation is of a few instances when Plaintiff reported to various law-enforcement agencies that he was being stalked, harassed, nearly run off the freeway, and other ways threatened by the FBI's illegal activities. These events paint a clearer picture of the circumstances surrounding the theft of Plaintiff's personal property:

30.  On Saturday, **November 26, 2022**, the FBI wrongfully took and withheld from Plaintiff's possession personal property in the form of computers and other articles, intending to permanently deprive Plaintiff of the benefit of said property as he dined at Panera Bread in Cerritos, California.

31.  On Sunday, **November 27, 2022**, the day after the theft, Plaintiff received the following text message on his Samsung A10e (number ending in 6224): "Thanks for filing a stolen device claim with Assurant for your T-Mobile device." The stolen device was Plaintiff's Samsung A32-5G (number ending in

14

8440), which the FBI wrongfully took and withheld from Plaintiff's possession with the intention to permanently deprive Plaintiff the benefit of said property as he dined at Panera Bread in Cerritos, California.

32. On Monday, **November 28, 2022a (5:42 a.m.),** Plaintiff received the following text message on his Samsung A10e (number ending in 6224): "Assurant: Here's your tracking number for your replacement device shipped 11/27/2022." This necessary action was because the FBI wrongfully took and withheld from Plaintiff's possession his Samsung A32-5G number ending in 8440 with the intention to permanently deprive Plaintiff of the benefit and use of this cell phone.

33. On Monday, **November 28, 2022b,** Plaintiff purchased a new computer laptop from Best Buy (00008722), 12118 Lakewood Blvd., Downey, California in the amount of $663.99 because the FBI wrongfully took and withheld from Plaintiff's Microsoft Surface Pro 4 tablet computer possession with the intention to permanently deprive Plaintiff the benefit of said tablet computer.

34. On Monday, **November 28, 2022c,** Detective Aguirre of the LASD Cerritos station told Plaintiff that a detective was sent to Panera Bread to view the video of larceny being committed as the undercover FBI agent stole Plaintiff's computer items on November 26, 2022. The reality of the actual existence of this hard evidence stressed Plaintiff out even more.

15

35. On Monday, **November 28d, 2022**, Panera Bread manager Dante, who was off work during the evening of the theft and to whom Sonya reports (see paragraph 9), left the following voicemail on Plaintiff's cell phone number ending in 6224: "Hi Firpo, this is Dante from Panera Bread. I was calling to talk to you about what happened on Saturday [November 26, 2022]. First, I'd like to apologize. We've done something that we hope doesn't happen, and I know you typically feel safe in the café, so I do apologize about that situation. But we're trying to do what we can to help you. So, I just had a couple of questions regarding that night." This well-intended message reminded Plaintiff of the enormity of his loss, exacerbated by the knowledge that Sonya may have been complicit.

36. On Tuesday, **November 29, 2022**, Plaintiff received his replacement cell phone, a Samsung A32-5G, with the number ending in 8440. This replacement cell phone was necessary because the FBI wrongfully took and withheld from Plaintiff his original cell phone, intending to permanently deprive Plaintiff of the benefit of its usage.

37. On Wednesday, **December 7, 2022**, Plaintiff was in Murietta, California, to teach a class at the University of Phoenix Learning Center when he saw a man fitting the description of the undercover FBI agent (Agent A for this date entry) described by the Panera Bread server. Agent A appeared at the Shell gas station off the Murietta Hot Springs exit of the 15 freeway, where Plaintiff was

16

getting gas before class. Agent A, with an empty gas container in hand, approached

Plaintiff, pretending that he was low on gas, and was unsure if he and his

"girlfriend" sitting in the passenger side front seat (another FBI agent, Agent B)

would make it to San Diego to get her car. After exchanging greeting pleasantries,

Agent A asked Plaintiff if Plaintiff could loan him some money for gas. Plaintiff

responded that he would rather pay directly for the gas with his debit card.

Plaintiff, who suspected Agent A was indeed an FBI agent, had filled his own tank

and volunteered to pump Agent A's gas. Plaintiff then asked Agent A how much

gas it takes to fill the tank. This simple question stumped Agent A, who needed to

determine the answer. Befuddled, Agent A asked his "girlfriend" partner, Agent B,

who confidently answered, "65 dollars." It struck Plaintiff as odd that Agent B

knew precisely how much it took to fill the car, even though it was not hers. Agent

B now emerged from the passenger side with a box of jewelry in her hand and

gave Plaintiff the option to select any two that he desired to thank him for his

generosity, saying that it would be a nice gift for Plaintiff's "wife or girlfriend."

This kind gesture of gratitude alerted Plaintiff that these were indeed FBI agents.

After declining the offer, it occurred to Plaintiff that Agent B just said, "wife or

girlfriend." He pondered, "Why didn't she include daughter, granddaughter,

mother, sister, or other female relative? How does she know that I am not gay, and

don't have a female significant other?" Plaintiff knew the answers to these

questions. He was acutely aware that the FBI knew that his mother was deceased, that he was estranged from his daughter, granddaughter, and sisters, and that, as a Christian minister, he was neither gay nor bisexual. These two agents disguised themselves at the Shell station, intending to hinder Plaintiff's enjoyment of peace and privacy.

38. On Thursday, **December 8, 2022**: Stressed and desperate, Plaintiff discovered corrupted files after taking a deeper dive into one of his cloud drives. This clearly showed that these filets were purposefully, deliberately, and strategically corrupted. This act was further confirmation that the FBI wrongfully took and withheld from Plaintiff's possession his computer files with the intention to deprive Plaintiff of the benefit of these files permanently.

39. On Tuesday, **December 13, 2022**: Plaintiff emails Dr. Don K. Nakayama, editor of *The American Surgeon* and a fellow member American College of Surgeons, requesting a copy of the manuscript he submitted since the original was on one of Plaintiff's computers that the FBI wrongfully took and withheld from Plaintiff's possession intending to permanently deprive Plaintiff the benefit of having the file on the stolen computer. The FBI conspired to oppress Plaintiff by denying him the opportunity to be published.

40. On Wednesday, **December 14a, 2022**: Plaintiff sent Nakayama a grateful email acknowledging receipt of the manuscript file, unaware that the FBI

18

was conspiring to injure Plaintiff to procure him to be charged or arrested for espionage.

41.   On Thursday, **December 14b, 2022**, Plaintiff received a bogus email from the FBI pretending to be Nakayama, with Nakayama (who is Japanese American) dressed in Communist Chinese military attire, unaware that the FBI was conspiring to injure Plaintiff, to procure him to be charged or arrested for espionage.

42.   On Friday, **December 14c, 2022**, Plaintiff forwarded a copy of said incriminating email to his alternate email address, fearing that the FBI's cyber operations unit might delete it. This unit had already hijacked Plaintiff's Gmail account several times, forcing Plaintiff to recover it repeatedly. Already struggling emotionally under the duress of having the FBI steal his items, Plaintiff felt that the FBI's intervention in emails between him and Nakayama was one of the more egregious acts to sabotage Plaintiff's career. All the while, Plaintiff was unaware that the FBI was conspiring to injure Plaintiff to procure him to be charged or arrested for espionage.

43.   On Thursday, **December 15, 2022**, Plaintiff filed a complaint with the DOJ Office of Professional Responsibility and received a submission acknowledgment. [See Exhibit 11.] Plaintiff had reason to be downcast given that since a FISA warrant is involved, the DOJ Office of Professional Responsibility

19

would pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant arrangement.

44.  On Tuesday, **January 3, 2023a,** Plaintiff called the Department of Justice Office of the Inspector General Investigative Division three times on the morning of Tuesday, January 3, 2023 (7:36 am, 7:43 am, and 8:17 am, all Pacific Standard Time). There was no answer the first time. It rang several times until it switched to a busy signal. Someone answered but was silent before they disconnected the second time. And, like the first time, there was no answer the third time. Plaintiff was convinced that the Department of Justice Office of the Inspector General Investigative Division was doubling down on their conspiracy to pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant process.

45.  On Tuesday, **January 3, 2023b,** at 8:30 a.m., Plaintiff submitted an official complaint to the U.S. Department of Justice Office of the Inspector General at 8:29 a.m. [See Exhibit 12]. In Plaintiff's words, submitting a complaint to the Department of Justice was tantamount to the "fox guarding the henhouse." Plaintiff was sure that the Department of Justice Office of the Inspector General was bolstering its position to conspire to pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant process.

20

46.   On Tuesday, **January 6, 2023,** Plaintiff called the Department of Justice and creatively reached an employee ("Cheryl"). After Plaintiff explained to a startled Cheryl how he managed to get her, he related that he was attempting to call someone in the OIG's Investigative Division but that the lines were not working correctly. Cheryl nervously stated that it was not her section but that he was trying to connect with, but that she would transfer Plaintiff to "Anthony." Plaintiff repeated to Anthony how he reached him, after which Anthony apologized for the lines not working and said he would report that the main number was inoperative. After consulting his supervisor, Anthony provided Plaintiff with two alternative telephone numbers for the OIG Investigative Division. Plaintiff perceived these tactics as part of the conspiracy to pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant process.

47.   On Thursday, **January 12, 2023,** Plaintiff called the main telephone number for the OIG Investigative Division and spoke with a person identifying herself as Operator 6. When Plaintiff asked her approximately how long it would take for his complaint to be addressed, she stated that there was no time frame, and neither was there a way to expedite the process. Plaintiff expressed his disappointment and hoped to be still alive if and when they got around to his complaint because he had good reason to believe that the FBI had bugged his cell phones. He shared that since he submitted the complaint, numerous suspicious

cars, with high-intensity bright headlights, have been following him, and that any and everywhere he went--whether to the grocery store, gym, or café shop--some suspicious character(s) invariably showed up, some with a white earpiece in many cases. Plaintiff surmised that he was being put off by Operator 6 as part of the conspiracy to pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant process. The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff distress and fearing for his life and safety.

48.  On Tuesday, **January 24, 2023,** Plaintiff called the LASD station in Cerritos, California, to inquire about the investigation of his items stolen from Panera Bread and spoke with Detective Aguirre. According to Detective Aguirre, a detective was sent to Panera Bread to view the video of the crime, which clearly showed Plaintiff's items being stolen on November 26, 2022. Regrettably, for nearly two months, no one from the Sheriff's Department ever contacted Plaintiff. Moreover, Detective Aguirre told Plaintiff that the case was open indefinitely. Plaintiff believes that the stalling on the part of Detective Aguirre was inspired by the FBI and is part of the conspiracy to pervert or obstruct justice or the due administration of the laws.

49.  On Thursday, **February 9a, 2023,** Plaintiff reported to the LASD Lakewood station [see Exhibit 13] that a stalker sat outside Plaintiff's office in a

22

white Nissan with license plate number 8BDE800. [See Exhibit 14.] The stalker boldly and calmly sat in his car as Plaintiff took a cell phone photo of the license plate and then sped off *after* Plaintiff crossed the street out of earshot and called the police. This is one of the many ways Plaintiff knows his phone is bugged. All the while, the stalker's accomplice was inside the storage facility where Plaintiff's converted storage unit office is located, pretending to be doing business. This second stalker's car was a Mitsubishi Mirage, license plate number 8WFA981 [See Exhibit 15], which was parked within the facility at the time. When Plaintiff took a cell phone photo of the license plate and, after that called the police—again, out of earshot—the second stalker suddenly and abruptly stopped what he was doing, hastily entered the vehicle, and drove off before the police arrived. Since both stalkers, undercover FBI agents, left the scene before the police arrived, Plaintiff called back and canceled the calls. The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff to be distressed and to be in fear for his life and safety.

50.  On Thursday, **February 9b, 2023**, Plaintiff reported to the Downey, California police department [see Exhibit 16] that a red Ford Mustang with a dark rear windshield, license plate number 8VKP441 [see Exhibit 17] had been stalking him. Like so many other cars used by the FBI, this vehicle's front windshield was illegally tinted. [See Exhibit 18.] The FBI stalked Plaintiff with the intention to

23

harass him by aggressively surveilling him, causing Plaintiff to be distressed and to be in fear for his life and safety.

51.  On Thursday, **February 9c, 2023**, Plaintiff, an avid reader, was disturbed to learn that the FBI's ethics, attitudes, behaviors, and philosophical outlook had degraded considerably, according to former Special Agent Nicole Parker, who testified before the House Select Subcommittee on the Weaponization of the Federal Government on this date and made the following statement: "The Bureau's mission should have remained the same, but its priorities and governing principles shifted dramatically. The FBI became politically weaponized starting from the top in Washington and trickling down to the field offices," including the Los Angeles field office. (Ex-FBI agent Nicole Parker: Bureau 'politically weaponized, starting from the top' (nypost.com)) Plaintiff was currently experiencing the nefarious machinations of a "weaponized" FBI whose "priorities and governing principles shifted dramatically." Moreover, the Chair of the House Select Subcommittee on the Weaponization of the Federal Government, Representative Jim Jordan, at this same hearing declared: "In my time in Congress, I have never seen anything like this. Dozens and dozens of whistleblowers FBI agents coming to us, talking about what's going on, the political nature at the Justice Department." Plaintiff was victimized by the degradation of FBI culture that "dozens and dozens of whistleblower FBI agents" are enduring. These

24

sentiments align and are consistent with the FBI's conspiracy against Plaintiff to pervert or obstruct justice or the due administration of the laws.

52. On Friday, **February 10a, 2023**, Plaintiff reported to the LAPD front desk officer at 77th Street Division station [see Exhibit 19 for front of Officer Perez's card; see Exhibit 20 for back of card] that a gray Acura that he had seen following him before he believed had now been chasing him on the 105-freeway westbound. Since the vehicle had illegally tinted front windows as it followed him previously in the Bellflower area, Plaintiff photographed it before when it was parked. [See Exhibit 21 for gray Acura license plate # 7UBW372.] The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff to be distressed and to be in fear for his life and safety.

53. On Friday, **February 10b, 2023**, Plaintiff reported to the California Highway Patrol [see Exhibit 22 for narrative] that he believed a black Chevrolet Camaro with an illegally tinted front windshield, license plate number 9AGR984, which he had seen and photographed before [see Exhibit 23], had chased him on freeways including the 110 and 405. The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff to be distressed and to be in fear for his life and safety.

54. On Tuesday, **February 14a, 2023**, an FBI agent that Plaintiff had seen before followed Plaintiff to Panera Bread, Downey, CA. [See Exhibit 24.] Plaintiff

25

was able to take a clear photo of this agent. The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff to be distressed and to be in fear for his life and safety.

55. On Tuesday, **February 14b, 2023**, Plaintiff discovered, to his dismay, that FBI agents are growing more aggressive. While Plaintiff was peacefully sitting in his car in a secluded shopping mall parking lot in the City of Downey, two vehicles driven by undercover FBI agents sped into parking spaces near him. When Plaintiff noticed their aggressive driving, he turned on his cellphone video. One of them, a Black male, exited his car and approached Plaintiff's car threateningly as Plaintiff remained in the driver's seat. The agent then initiated a confrontation with Plaintiff. The other agent, a Latina, remained in the background as she avoided being recorded on video. Wanting to prevent escalation, Plaintiff left the area and proceeded directly to the Downey police station, where he related what occurred to the desk officer who gave him a card [see Exhibit 25] as well as an incident report [see Exhibit 26], along with a narrative page. [See Exhibit 27.] Before leaving the scene, Plaintiff had the presence of mind to photograph the cars of both agents. The male Black agent's car had the customary illegally tinted front windshield [see Exhibit 28], while the Latina agent's car was more traditional [see Exhibit 29]. The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff to be distressed and to be in fear for his life and safety.

26

56.  On Saturday, **February 18, 2023**, the FBI began acting with more

aggression and bravado. Plaintiff noticed a car with extremely high front beams

inside the storage facility where he has an office. When Plaintiff approached to

investigate, the vehicle sped toward him and then turned sharply to the left down

the roadway of about 100 yards separating two storage columns. Knowing that the

driver would have to escape through the only exit in the facility, Plaintiff waited

for the driver near the keypad, where he had to key out to exit. As the driver

lowered his window to access the keypad, Plaintiff noticed it was a white male in

his fifties. The driver was taciturn as he keyed out. While he did so, Plaintiff got a

brief description of the car and the license plate number (GLC583), which he said

aloud repeatedly so as not to forget. Plaintiff hurried back to his unit to retrieve his

cell phone and immediately dialed 911. After being connected to the dispatcher,

Plaintiff reported the incident. At least three patrol units and an aerial unit

helicopter were dispatched. The patrol cars were driven by Deputy Hocking (S/N

65759), Deputy Sandoval (S/N 637314), and training Deputy Milton. Plaintiff

implored the deputies to watch the facility's closed circuit television (CCTV) as

soon as the office opened and to check the computer to see who keyed out at that

precise time, which was about 8:24 p.m. The deputies said it would take some time

to get someone to watch the video. Deputy Sandoval handed Plaintiff the "Report

Information and Victims' Bill of Rights" with the Report Number LKD23049-

27

0280 [see Exhibit 30] and said she would return to work a few days later. At that time, Plaintiff asked why another deputy could not be available to watch the video as soon as possible. As if rehearsed, all the deputies present almost stated in unison that the same deputy (Sandoval) would stay on the case without interference from another deputy. The FBI conspired with the LASD Lakewood station to protect the identity of the undercover agent that stalked Plaintiff with intentions to harass him by aggressively surveilling him, causing Plaintiff to be distressed and in fear for his life and safety.

57.  On or about Tuesday, **February 28, 2023**, Plaintiff called the LASD Lakewood station and spoke with station Watch Commanders Lieutenants Maldonado and Ridley at separate times in an earnest effort to persuade them to dispatch a deputy to view the CCTV video in question, but to no avail. This stalling effort is consistent with the FBI's conspiracy against Plaintiff to pervert or obstruct justice or the due administration of the laws.

58.  On Wednesday, **March 1, 2023**, at approximately 5:45 p.m., LASD Deputy Sandoval and her partner visited the business office of Bellflower Self Storage, 14822 Lakewood Blvd, Bellflower, California, while Plaintiff was preparing to teach a 6:00 p.m. comparative religion class at the Ontario, California, campus of the University of Phoenix. After viewing the video, Deputy Sandoval called Plaintiff when he was about to start class and stated that she saw nothing out

28

of the ordinary or even remotely resembling the incident that Plaintiff described. After fast-forwarding and watching the CCTV video about an hour before and after the time Plaintiff stated that the suspect keyed out on Saturday, February 18, 2023, at 8:24 p.m., she noted that all she saw was Plaintiff waiting outside the front gate of Bellflower Self Storage for and a vehicle slowly and calmly leaving at the same time. Plaintiff responded that, fearing for his safety, he never waited outside the gate for deputies to arrive and that the FBI had about a week and a half (February 18, 2023 – March 1, 2023) to doctor the video. And then, Plaintiff asked Deputy Sandoval, "Do you think I conjured up the suspect's vehicle description and license plate that's in the incident report out of the air?" [See Exhibit 31.] Plaintiff is convinced that the doctored or manipulated video is perhaps the most damning evidence of the FBI's conspiracy against Plaintiff to pervert or obstruct justice or the due administration of the laws.

59.  On Thursday, **March 2, 2023**, Plaintiff called the LASD Lakewood station to request Deputy Sandoval's documented conclusion that the CCTV from Saturday, February 18, 2023, was devoid of any of the alleged actions of a perpetrator are reported by Plaintiff. Watch Commander Lieutenant Maldonado refused to accommodate Plaintiff, prompting Plaintiff to call back to make an appointment to speak with Captain Dan Holguin. However, Captain Holguin's secretary, Ariel, who Plaintiff had spoken with about two days before, again

29

refused to either allow Plaintiff to speak with Captain Holguin or to make an appointment to meet with him. As of this filing, Captain Holguin has not responded to Plaintiff's calls. Plaintiff perceives that Captain Holguin's refusal to speak with him is at the behest of the FBI as part of a conspiracy against Plaintiff to pervert or obstruct justice or the due administration of the laws.

60. Although the FBI has been surveilling Plaintiff since his first trip to the Soviet Union in January 1989, they have significantly intensified their efforts in the past several years—particularly the last six months, stalking him with fast cars with illegally tinted front windshields. (See, for example, Exhibit 32.) Under the direction of the DOJ, the FBI has bullied Plaintiff by enlisting its Cyber Ops unit to wrest his 20-year Facebook account with its nearly 1,500 friends from him and hijacked his Gmail account. Furthermore, the FBI has terrorized Plaintiff by weaponizing specially modified bright headlights with rheostat control (i.e., control from dim to bright as opposed to clicking bright lights on and off). They have been installed in older and later model vehicles, sometimes in one headlight (see Exhibit 33), apparently designed to cause temporary blindness. These extremely bright headlights are in excess of 300 lumens. (See Exhibit 34.) Moreover, since Plaintiff's cell phones are bugged, the FBI knew of the ancient coins he collected while in Tunis, Tunisia, when Plaintiff called an appraiser to determine their value. When Plaintiff attended and lectured at the American

30

College of Surgeons Clinical Congress 2022 from October 16 – 20, 2022, in San

Diego, CA, FBI agents vandalized Plaintiff's office at Bellflower Self Storage and

stole his ancient coins. Additionally, Plaintiff's car has a Global Position System

(GPS) tracking device. Plaintiff knows this because he has often eluded agents

following him. They invariably find him, flickering their extremely bright lights to

taunt him, sending the message that he cannot escape their detection as they

ceaselessly stalk him. The DOJ has dedicated substantial resources to prevent

Plaintiff from filing this lawsuit as they are acutely aware of the potential

precedent set facilitating the piercing of the FISA warrant and, in the process,

pervert or obstruct justice or the due administration of the laws.

### V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Larceny. Grand theft of personal property)

(10 U.S. Code § 921 – Article 121(a)(1); California Penal Code § 487 PC)

61.  Plaintiff realleges paragraphs 6, 8 through 10, 12, 13, 23, 24 through 36, and 38.

62.  By doing the acts described above in Paragraphs 6, 8 through 10, 12, 13, 23, 24 through 36, and 38, Defendants, while acting in an official capacity in their roles as federal government employees (Federal Tort Claims Act), committed the intentional tortious act of larceny by wrongfully taking and withholding Plaintiff's

31

personal belongings thereby denying Plaintiff the use and benefit of these belongings, hence, entitling Plaintiff to recover damages pursuant to 10 U.S. Code § 921 – Article 121(a)(1). Defendants committed grand theft by the wrongful appropriation of Plaintiff's belongings, which are worth over $950 pursuant to California Penal Code § 487 PC.

## SECOND CAUSE OF ACTION

(Violation of civil rights. Conspiracy against rights)

(Title 18, U.S.C., Section 241; California Penal Code § 182 PC)

63.  Plaintiff realleges paragraphs 11, 15 through 22, 37, 39 through 48, 57.

64.  By doing the acts described above in Paragraphs 11, 15 through 22, 37, 39 through 48, and 57, Defendants, while acting in an official capacity in their roles as federal government employees (Federal Tort Claims Act), caused and/or permitted the violation of Plaintiff's right to the free exercise or enjoyment of any rights so secured by conspiring against rights to injure, oppress, threaten, and intimidate Plaintiff, hence, entitling Plaintiff to recover damages pursuant to civil rights statute Title 18, U.S.C., Section 241. Defendants committed criminal conspiracy by conspiring to commit a crime and to procure Plaintiff to be charged for the crime of espionage and to pervert or obstruct justice or the due administration of the laws pursuant to California Penal Code § 182 PC.

/

32

/
/

**THIRD CAUSE OF ACTION**

(Stalking)

(18 U.S. Code § 2261A)

65.  Plaintiff realleges paragraphs 7, 49 through 56, and 58 through 60.

66.  By doing the acts described above in Paragraphs 7, 49 through 56, and 58 through 60, Defendants, while acting in an official capacity in their roles as federal government employees (Federal Tort Claims Act), acted to harass and intimidate Plaintiff that placed him in reasonable fear of death or serious bodily injury which caused substantial emotional distress, entitling Plaintiff to recover damages pursuant to 18 U.S. Code § 2261A.

**VI. EXHAUSTION OF ALL ADMINISTRATIVE REMEDY**

67.  Plaintiff is seeking judicial review after being purposefully ignored by the DOJ after numerous attempts to get answers (see, e.g., Exhibit 11 and Exhibit 12 in connection with paragraphs 43 through 47). Disregarding Plaintiff rendered the DOJ's decision as being "final" under § 10(c) of the APA, 5 U.S.C.S. § 704 (Darby v. Cisneros | Case Brief for Law School | LexisNexis). It became abundantly clear to Plaintiff that "further administrative review would have been futile," and that the decision-maker at the DOJ "would have abused his discretion

33

by indefinitely extending the time limitations for administrative review" (Darby v. Cisneros | Case Brief for Law School | LexisNexis) to avoid potentially jeopardizing the FISA warrant arrangement. "Were courts free to impose an exhaustion requirement as a rule of judicial administration where agency actions had already become 'final' under § 10(c) of the APA, 5 U.S.C.S. § 704? ANSWER: No" (Darby v. Cisneros | Case Brief for Law School | LexisNexis). Ultimately, "The Court held that the exhaustion doctrine continued to apply as a matter of judicial discretion in cases not governed by the APA" (Darby v. Cisneros | Case Brief for Law School | LexisNexis). Plaintiff humbly requests the court to exercise its judicial discretion in this unusual FISA warrant case, which is "not governed by the APA," and allow this lawsuit to proceed.

### Request for Permanent Injunctive Relief

70.  Plaintiff requests the court to impose permanent injunctive relief by ordering the FBI to discontinue its thefts, conspiracies against Plaint's civil rights, various acts of stalking, harassment, threats, intimidation, all cyberattacks, all disruptive acts against Plaintiff's academic and business endeavors, and all other illegal acts that it has perpetrated against Plaintiff in perpetuity.

### Request for Relief

WHEREFORE, the Plaintiff requests:

34

71. Compensation for damages, including general and special damages, according to proof.

72. $20,000,000.00

72. Any further relief of which the court may deem appropriate.

73. The return of all Plaintiff's stolen property, including computer files.

### Demand for a Jury Trial

Plaintiff hereby requests a jury trial on all issues raised in this complaint.

EXHIBIT 1

*Exhibit 1*

Photo showing the FBI's Wi-Fi network, March 1, 2023.

CV-126 (09/09)                    PLEADING PAGE FOR A COMPLAINT

EXHIBIT 2

*Exhibit 2*

Page 1 of photo where server describes suspect, November 26, 2022.

EXHIBIT 3

*Exhibit 3*

Page 2 of photo where server describes suspect, November 26, 2022.

EXHIBIT 4

*Exhibit 4*

Photo of Sheriff deputy's incident pamphlet, "Grand Theft," November 26, 2022.

EXHIBIT 5

*Exhibit 5*

Photo of deputy's Incident Report Narrative (see third paragraph).

EXHIBIT 6



*Exhibit 6*

Photo of email spoofed by the FBI, dated December 14, 2022, supposedly

from Dr. Don K. Nakayama, complete with bogus photograph.

41

EXHIBIT 7

1
2
3
4
5
6
7
8
9
10
11
12



*Exhibit 7*

13
14

An enlarged photo of Dr. Don K. Nakayama from spoofed email.

15
16
17
18
19
20
21
22
23
24
25

*Exhibit 8*

26

An authentic photo of Dr. Don K. Nakayama.

27
28

42

EXHIBIT 8



*Exhibit 7*

An enlarged photo of Dr. Don K. Nakayama from spoofed email.



*Exhibit 8*

An authentic photo of **Dr. Don** K. Nakayama.

42

EXHIBIT

Men Solid Red Star Army Cool Flat Top Caps China Communist Party Men International Brigades Army

CLIMATE®

*Exhibit 9*

Chinese Communist Party military hat. It has the same red star as the hat in the fake photo of Dr. Don K. Nakayama from spoofed email.

43

EXHIBIT 10

*Exhibit 10*

Cell phone photo of corrupted files retrieved by Plaintiff,

which have since been removed from Plaintiff's Dropbox

cloud computer storage by the FBI's Cyber Ops Unit.

44

EXHIBIT 11



*Exhibit 11*

Screenshot acknowledgement of Plaintiff's filed complaint with the DOJ

Office of Professional Responsibility, December 18, 2023.

45

EXHIBIT 12



*Exhibit 12*

Screenshot acknowledgement that Plaintiff filed complaint with the

DOJ OIG Investigative Division, January 3, 2023.

46

EXHIBIT 13



*Exhibit 13*

LASD report showing FBI Stalking Suspect #1 parked across the street from where he knew Plaintiff worked. Ad FBI Stalking Suspect #2, an accomplice, inside storage facility was Plaintiff was working. (February 9, 2023)

47

EXHIBIT 14



Exhibit 14: Vehicle and license plate of FBI Stalking Suspect #1.



Exhibit 15: Vehicle and license plate of FBI Stalking Suspect #2.

EXHIBIT 15



Exhibit 14: Vehicle and license plate of FBI Stalking Suspect #1.

Exhibit 15: Vehicle and license plate of FBI Stalking Suspect #2.

48

BLUEBIRDonline.com (800) 477-0700

EXHIBIT 16



*Exhibit 16*



*Exhibit 17*

Red Mustang (8VKP441) dark rear windshield.



*Exhibit 18*

Red Mustang (8VKP441) illegally tinted front windshield.

49

BLUEBIRDonline.com (800) 477-0750

**EXHIBIT 17**



*Exhibit 16*



*Exhibit 17*

Red Mustang (8VKP441) dark rear windshield.



*Exhibit 18*

Red Mustang (8VKP441) illegally tinted front windshield.

49

BLUEBIRDonline.com (888) 477-0760

EXHIBIT 18

1
2
3
4
5
6
7
8



*Exhibit 16*

9
10
11
12
13
14



*Exhibit 17*

15
16

Red Mustang (8VKP441) dark rear windshield.

17
18
19
20
21
22
23

*Exhibit 18*

24
25
26

Red Mustang (8VKP441) illegally tinted front windshield.

27
28

49

CV-126 (09/09)                    PLEADING PAGE FOR A COMPLAINT

BLUEBIRDonline.com (888) 477-0700

EXHIBIT 19



*Exhibit 19*

LAPD Desk, Officer Perez Serial # 44903 (card front), February 10, 2023.



*Exhibit 20*

LAPD Desk, Officer Perez Serial # 44903

(card back), February 10, 2023.

50

*BLUEBIRD*online.com (888) 471-0700

EXHIBIT 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit 19*

LAPD Desk, Officer Perez Serial # 44903 (card front), February 10, 2023.

*Exhibit 20*

LAPD Desk, Officer Perez Serial # 44903

(card back), February 10, 2023.

50

EXHIBIT 21

*Exhibit 21*

Vehicle with illegally tented front windshield associated

with the LAPD report in Exhibits 18 and 19, February 10, 2023

51

BLUEBIRDOnline.com 1996 471-0050

EXHIBIT 22

STATE OF CALIFORNIA
NARRATIVE/SUPPLEMENTAL
CHP 556 (Rev. 3-10) OPI 060

Page 1 of 1

FEB 10, 2023    05:00

☐ Narrative    ☐ Crash Report    ☐ BA Update    ☐ Fatal    ☐ Hit and Run Update
☑ Supplemental    ☑ Other:    ☐ Hazardous Materials    ☐ School Bus    ☑ Other

LOS ANGELES COUNTY

105, 110, 405, 605

☑ Yes    ☐ No

1. I, AN UNKNOWN PERSON IN A TINTED FRONT WINDSHIELD
2. FOLLOWED ME ONTO THE 105 FWY WESTBOUND, DRIVING
3. AGGRESSIVELY AS THEY DID SINCE THE FRONT WINDSHIELD
4. WAS TINTED, I COULD NOT DETERMINE THE RACE OR SEX
5. OF THE PERSON. SEVERAL CARS CARS WITH TINTED FRONT
6. WIND SHIELDS HAVE BEEN FOLLOWING ME AND HARAS-
7. SING ME BY DRIVING AGGRESSIVELY AND WHEN THEY MAKE
8. A U-TURN, OR WHEN I STOP AT THE STORE AND RE-
9. TURN TO MY CAR, THE CARS WILL HAVE THEIR
10. HIGH-BEAMS ON, SEEMLY IN AN ATTEMPT TO BLIND
11. ME TEMPORARILY. THE VEHICLE PURSUING ME AROUND
12. THE DATE AND TIME ABOVE DID SO UNTIL I MANAGED
13. TO MAKE AN UNEXPECTED ILLEGAL U-TURN TO LOSE
14. THEM, FORTUNATELY, IT WORKED. STILL, THIS MOST
15. RECENT INCIDENT LEFT ME FEELING UNEASY, TO FINISH
16. THE SCENARIO, I EXITED THE 105 WB AT CENTRAL
17. AVE. AND EVENTUALLY WOUND UP AT LAPD SE DIV
18. AROUND 108TH + MAIN. REGRETTABLY, IT WAS CLOSED.
19. EVENTUALLY, I MADE MY WAY TO THE 105 EB, TO THE
20. 110 SB, WHEN I NOTICED THEY WERE ON MY TAIL
21. AGAIN, I WENT TO THE 91 EB TO 605 NB, AND EXITED
22. ALONDRA BLVD. TO A WELL LIT AREA (HOME DEPOT,
23. LA FITNESS) AT WHICH TIME THEY PULL INTO ONE OF
24. THE PARKING SPACES AWAY FROM ME. AFTER AWHILE
25. (90 MIN, APPROX), I WENT TO THE CERRITOS COLLEGE
26. PARKING LOT. FORTUNATELY, THEY DID NOT FOLLOW ME.
27. AFTER GATHERING MYSELF, I WENT ONLINE TO LOCATE
28. THE NEAREST CHP BRANCH AT ONE POINT WHILE THEY
29. WERE PARKED, I PHOTOGRAPHED THE VEHICLE, ALBEIT
30. ON ANOTHER RECENT OCCASION IT IS A CHEVY CAMERO,
31. CA# 9AGR984, BLACK IN COLOR.

*Exhibit 22*

CHP Report, February 10, 2023.

52



EXHIBIT 23

BLUEBIRDonline.com (800) 471-0701

*Exhibit 23*

Vehicle with illegally tented front windshield, plate 9AGR984, associated

with the CHP Report in Exhibit 21, February 10, 2023.



EXHIBIT 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



*Exhibit 24*

19    Stalker who exhibits the behavior of an undercover FBI agent who

20    has been following Plaintiff for at least two years. (February 14, 2023, 6:59 am)

21
22
23
24
25
26
27
28

54

BLUEBIRD online.com 1-800-472-0755

EXHIBIT 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16            *Exhibit 25*

17        February 14, 2023.

18
19
20
21
22
23
24
25
26
27
28

55

BLUEBIRD GRAPHIC COPY 3066 477-0200

EXHIBIT 26

*Exhibit 26*

Downey police Incident Report associated

with Exhibit 25, February 14, 2023.

CV-126 (09/09)                 PLEADING PAGE FOR A COMPLAINT

BLUEBIRDonline.com 1888 477-0202

EXHIBIT 27

CAD Narrative

02/14/2023 : 16:50:31 bflina Narrative: RP ADVISED UNK SUBJS FOLLOWING HIM WHILE RECORDING SUBJECTS. M-B APPROACHED HIM AND MADE WHAT THE RP FELT WERE THREATENING STATEMENTS, AND THE SUBJ WALKED BACK TO HIS VEH. VICT RECORDED A GRY HONDA ACCORD OR CIVIC 8JUJ815. RP ADVISED.
02/14/2023 : 16:41:17 mrula Narrative: INC NUM TO 23/OLIVARES

CONFIDENTIAL

*Exhibit 27*

Downey police Incident Report Narrative associated with Exhibits 25 and 26, February 14, 2023.

BLUEBIRDonline.com

EXHIBIT 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



*Exhibit 28*

Stalker's car (plate # 8JUJ815) who threatened Plaintiff associated

with Exhibits 25, 26, and 27, February 14, 2023.

18
19
20
21
22
23
24
25
26
27
28

58

BLUEBIRDonline.com (888) 479-0500

EXHIBIT 29

*Exhibit 29*

Stalker partner's car (plate # 8LYU154) associated

with Exhibits 25, 26, 27, and 28 February 14e, 2023.

59

EXHIBIT 30

*Exhibit 30*

LASD Lakewood pamphlet (February 18, 2023).

60

EXHIBIT 31

BLUEBIRDonline.com 866.477.0760

```
Message print requested by terminal:LKDS    02/19/23 17:08:54  P01

INCIDENT RECORD  02/19/23  1707

LKD23049-0280  10/98
UNITS: 133E/P 133/P 133B/P 133D/P 133T1/P
PRIORITY: P  RADIO CODES: P245
LOCATION: 14822 LAKEWOOD BL,BLF "BLF SELF STORAGE"
VEHICLE: 8GLC583/CA
INF: FIRPO CARR, 513 764 6224
REMARKS:GEO:VEH ATTEMPTED TO RUN OVRINF INSIDE STORAGE FACILITY.
GRY SEDAN 8GLC583 L/S N/B LAKEWOOD BL.
CLEAR: 777/940 RD: 1332
C/CARR,FIRPO MB/091754 NO EV OF 245, VEH TURNED TO AVOID HIM
. INF STORY CHANGED, BELIEVES MULT CARS TRYING TO HIT HIM LATELY
, POSS 918

/2027 CALL LKD05

133/P:      /2031 DSPS  /2031 ENR   /2034 ENR   /2034 10/97 /2111 10/98
            /2031 ACKOV
            /2031 DSPS  /2036 NOACK /2036 DSP   /2039 10/97 /2105 10/98
133B/P:     /2038 ACKOV   /2038 ENROV
133D/P:     /2033 DSPS  /2033 ACK   /2033 ENR   /2042 10/97 /2044 10/98
133E/P:     /2031 DSP   /2031 ENR   /2036 10/97 /2059 10/98
            /2031 ACKOV
133T1/P:    /2031 DSP   /2031 ACK   /2031 ENR   /2032 10/97 /2051 10/98
```

*Exhibit 31*

Gray sedan with plate # 8GLC583 that left site headed northbound on

Lakewood Blvd. as documented here dated February 19, 2023.

61



EXHIBIT 32

BLUEBIRDOnline.com (888) 477-0005

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit 32*

High performance car with illegally tinted front windshield.



EXHIBIT 33

*Exhibit 33*

Vehicle in upper right corner of photo with extremely

high passenger side front headlight.

63

EXHIBIT 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit 34*

One of numerous FBI vehicles with extremely high

headlights that follow Plaintiff wherever he goes.

64