Firpo Wycoff Carr
4067 Hardwick Street, #330
Lakewood, CA 90712
(513)764-6224
firpocarr@firpocarr.com
Plaintiff In Pro Se

**FILED**

CLERK, U.S. DISTRICT COURT

## SEP 19 2023

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ rsm _____ DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. FIRPO WYCOFF CARR, PHD<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>UNITED STATES OF AMERICA,<br>UNITED STATES DEPARTMENT OF<br>JUSTICE, FEDERAL BUREAU OF<br>INVESTIGATION, and Does 1-10<br>　　　　Defendants. | Case No.: 2:23-cv-01813-ODW-MAA1<br><br>**COMPLAINT FOR BIVENS CLAIMS UNDER THE UNITED STATES CONSTITUTION AND FOR FEDERAL TORT CLAIMS ACT**<br><br>**(AMENDED)**<br><br>**[DEMAND FOR JURY TRIAL]** |

COMES NOW, Plaintiff DR. FIRPO WYCOFF CARR, PHD ("DR, CARR"), who

alleges causes of action against Defendants FEDERAL BUREAU OF INVESTIGATION

("FBI"), UNITED STATES DEPARTMENT OF JUSTICE ("DOJ"), and DOES 1-10,

inclusive, as follows:

### I. INTRODUCTION

1.　　This is an action for injunctive relief and declaratory relief and damages in

that the Plaintiff was denied his rights under the Fourth, Fifth, and Fourteenth

Amendments of the Federal Constitution and under California Law. As a result of traveling to Communist Red China three times, Defendants stole Plaintiff's computers in hopes of finding files that would incriminate him as a foreign spy for the Chinese government, which caused Plaintiff irretrievable damage to his professional and personal life. Plaintiff requests a jury trial.

2.      The claims herein are additionally brought pursuant to the Federal Tort Claims Act (28 U.S.C. § 2671, et. seq. and 1346(b)(1)) for money damages as compensation for loss of property and personal injuries that were caused by the misconduct of FBI agents, inter alia, intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, negligence, and invasion of privacy, while acting within the scope of their offices and employment, under circumstances where the Defendant United States of America, if a private person, would be liable to the Plaintiff in accordance with the laws of the State of California.

3.      All of the foregoing claims are based on the unlawful treatment of Plaintiff by Defendants FEDERAL BUREAU OF INVESTIGATION ("FBI") and UNITED STATES DEPARTMENT OF JUSTICE ("DOJ").

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 2671, 1331, 1343(a)(3), 1343(a)(4), 1346(b), and 1367, 1402(b), 2401(b), and §§2671-2680.

5.      Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act (FTCA).

6.      This suit has been timely filed and Plaintiff has exhausted all administrative remedy. In Plaintiff's original complaint, he sought judicial review after being purposefully ignored by the DOJ after numerous attempts to get answers. Disregarding Plaintiff rendered the DOJ's decision as being "final" under § 10(c) of the APA, 5 U.S.C.S. § 704 (*Darby v. Cisneros* | Case Brief for Law School | LexisNexis). It became abundantly clear to Plaintiff that "further administrative review would have been futile," including the submission of The Standard Form 95 (Plaintiff presents a sum certain in the present document), used when filing a federal tort claim, and that the decision-maker at the DOJ "would have abused his discretion by indefinitely extending the time limitations for administrative review" (*Darby v. Cisneros* Case Brief for Law School LexisNexis) to avoid potentially jeopardizing the FISA warrant arrangement. In this regard, Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act (FTCA). "Were courts free to impose an exhaustion requirement as a rule of judicial administration where agency actions had already become `final' under § 10(c) of the APA, 5 U.S.C.S. § 704? g ANSWER: No" (*Darby v. Cisneros* | Case Brief for Law School | LexisNexis). Ultimately, "The Court held that the exhaustion doctrine continued to apply as a matter of judicial discretion in cases not governed by the APA" (*Darby v. Cisneros* | Case Brief for Law School | LexisNexis). Plaintiff humbly requested the Court

to exercise its judicial discretion in this unusual FISA warrant case, which is "not governed by the APA," and allow this lawsuit to proceed. Plaintiff is grateful that the Court gave its consent to proceed (ECF 7).

7.      Venue is appropriate in the Central District of California under 42 U.S.C. § 2000 *et seq.* in that the unlawful conduct complained of and the employment records relevant to such conduct are maintained and administered in the Central District of California. Venue is also proper under 28 U.S.C. § 1391(e)(l)(2) in the Central District as it is the place where Defendants reside and where a substantial part of the acts or omissions occurred.

## III.  PARTIES

8.      **Plaintiff** Dr. Carr is a law-abiding senior African American male approaching age 70 with no criminal record who is a Los Angeles native hailing from South Central Los Angeles and residing in the County of Los Angeles. As a research psychologist who has studied medicine and who specializes in the mental health of surgeons, he is a member in good standing with the American Psychological Association ("APA"), the American Medical Association ("AMA"), and the American College of Surgeons ("ACS").

9.      Dr. Carr has authored several books and has a registered trademark with the United States Patent and Trademark Office ("USPTO"). He has also traveled to over 80 countries, lands, and islands of the sea. He is a seminary-trained ordained minister with a

Ph.D. in Computer Information Systems, a Ph.D. in Health Psychology, a Master of Arts

in Management, a Master of Arts in Urban Ministry, and a Bachelor of Arts in

Information Systems Management. As a Health Psychologist, he volunteered to write

curricula and teach courses in health, critical thinking, and Bible studies at Union Rescue

Mission (URM) on Skid Row in downtown Los Angeles. He also taught these courses at

URM's Hope Gardens Family Center facilities for elderly women and single mothers

with children in Sylmar, California.

10.    Dr. Carr received worldwide recognition for his 300-page dissertation with

300 references titled, "Exploring Surgeons' Attitudes and Behaviors Toward the

Bloodless Policy and Emergency Treatment of Jehovah's Witnesses Relative to Patient-

Centered Care and Evidence-Based Medicine: A Multiple-Case Study." In a letter dated

March 27, 2023, ProQuest, a well-respected global information-content and technology

company, wrote Dr. Carr: "Congratulations! We are excited to inform you that your work

is being accessed by other researchers and libraries around the world. As a result of their

interest in your work you have earned a royalty payment from purchases of your

dissertation or thesis through ProQuest in all formats, including downloads, print, and

microfilm."

11.    Dr. Carr teaches at the University of Phoenix (30 years and counting) and

has taught at the University of California at Los Angeles ("UCLA") Extension and

Mount Saint Mary's College (now Mount Saint Mary's University), also in Los Angeles.

He spent ten years (1994-2004) as a civilian employee with the Los Angeles Police Department (LAPD), starting as a Systems Analyst II with expertise in cybercrime. He was later promoted to Assistant-Officer-In-Charge ("AOIC").

12.     At that time, Dr. Carr received 80 hours of training while attending LAPD Detective School, which covered various topics such as Terrorism Awareness, and received a certificate upon completion, after which he trained LAPD detectives on the Detective Case Tracking System ("DCTS"). Before joining the LAPD, International Business Machines (IBM) hired Plaintiff as a Customer Engineer, after which he received extensive training during his ten years (1979-1989) with the company.

13.     Because of his computer proficiency, Dr.Carr was subpoenaed as an expert witness for the LAPD and appeared before Judge Lance Ito in 2002. Judge Ito had presided over the O.J. Simpson murder trial in 1995, and his wife, Margret York, was the first woman to be promoted to Deputy Chief in the LAPD in 2000 when Plaintiff was with the Department.

14.     Regarding Dr. Carr's involvement in the September 11, 2002, memorial services, the following letter was received from Department psychologist Dr. Kevin Jablonski, Commanding Officer of Behavior Sciences Services of the LAPD, and the Interfaith Remembrance Service Coordinator, on October 17, 2002:

15.     "Dear Firpo: I want to thank you once again for the outstanding job you did as our announcer for the September 11th Interfaith Remembrance Service. Your

presentation was strong and articulate and your intonation appeared very much tempered to the mood of the Service. I received a number of compliments about you from those in attendance, including many elected officials. As you may recall, we made every effort to facilitate a good turnout of clergy, elected officials, foreign dignitaries and residents of the Greater Los Angeles area. In the end, it appears that we had over 5,000 attendees and clearly many more that watched the Service as it was televised live on the Fox Network and CNN. Over 220 clergy were present representing over 30 different religious denominations. This included many of the titular heads of the local churches, elected officers of religious organizations and many more reverends, rabbis, swamis, nuns, imams and other clergy. Seventy-three different foreign dignitaries were present representing over 60 different countries. Mayor James Hahn and 13 members of the Los Angeles City Council were also in attendance as were five of the elected county officials and the general managers of many City, County and State Offices, including Chief Pomeroy and Chief Bamattre. Our Department was represented by the presence of over 100 sworn officers and a significant number of employees attended the Service. In all, the Service appears to have moved a great many people. Thank you for (literally) lending your voice to those of many others in helping make this Service a success. Kevin."

16.    Dr. Carr's accomplishments as an author and university instructor have been admired by the likes of former President Bill Clinton, who excitedly received a copy of his best-selling book, *Germany's Black Holocaust: 1890-1945* (see Exhibit 1), and

former Florida Governor Jeb Bush (son of President George H. W. Bush and brother of President George W. Bush) who congratulated Plaintiff on his triumphs as a university instructor (see Exhibit 2). Over 200 students testify as to Dr. Carr's character and skills as a teacher. (Student Testimonials – The "New" Official Web Site of Firpo Carr)

17.     Dr. Carr was trained and received certification on the California Law Enforcement Telecommunications System ("CLETS"), a computer network primarily maintained by Defendant FBI that gives police departments access to national databases. Also, Dr. Carr's computer training includes being trained and certified on the FBI's National Crime Information Center ("NCIC") computerized database. The FBI's website reads regarding this center: "NCIC has operated under a shared management concept between the Federal Bureau of Investigation (FBI) and state and federal criminal justice users since its inception. The FBI provides a host-computer and telecommunication network to the control terminal agency in each of the 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam." Furthermore, Plaintiff attended mandatory training to become familiar with the FBI's Criminal Justice Information Services (CJIS).

18.     **Defendant** United States of America is subject to answer for wrongs committed in this judicial district.

19.     **Defendant** DOJ is a Department of the United States federal government, has offices throughout the nation, and is subject to answer for wrongs committed in this judicial district.

20.    **Defendant** FBI operates under the supervision and direction of the DOJ, and has offices throughout the nation, and is subject to answer for wrongs committed in this judicial district.

21.    The true names and capacities of DOE Defendants 1 through 10, inclusive, whether individual, corporate, associates or otherwise, are unknown to Plaintiff at the time of filing this Complaint and therefore Plaintiff sues said Defendants under such fictitious names. When their true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and thereupon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and Plaintiff's damages as herein alleged were proximately caused by such Defendants.

22.    Plaintiff is informed and believes, and thereupon alleges, that at all times herein mentioned each of the Defendants was the agent, employee and servant of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment, and servitude, with the knowledge and consent of each of the Defendants. Whenever this Complaint makes references to "Defendant," "Defendants,", such allegations shall be deemed to mean the acts of the Defendants acting individually, jointly, and/or severally.

///

///

## IV.  General Allegations

23.    On November 26, 2022, between 6:00 and 6:30 p.m., an undercover Special Agent from the Federal Bureau of Investigation (FBI), Los Angeles Field Office, working under the auspices of a Foreign Intelligence Surveillance Act of 1978 (FISA) warrant of which Plaintiff, a law-abiding African American male who is approaching age 70 with no criminal record who is suspected of being a spy for the Communist Red Chinese government is the subject, posed as a person experiencing homelessness and, exceeding his authority, stole the following items from Plaintiff when Plaintiff momentarily stepped away from the table he sat at while dining at Panera Bread (Café #1376), 11300 South Street, Cerritos, California 90703: one laptop computer, a Microsoft Surface Pro4, a Samsung A32-SG android phone (number ending in 8440), a Samsung Tab A computer tablet, a set of HyperX headphones, and a beige  satchel. Ultimately, the Special Agent worked with others, including Sonya, the manager on duty at the time, who is unknown to Plaintiff. Defendants have been heavily surveilling, stalking, and cyberstalking Plaintiff as if he were a criminal with something to hide since 1989. More recently, they tracked him to his job at the University of Phoenix, where they accidentally exposed their distinctive FBI Wi-Fi logo (see Exhibit 3).

### A.    FBI Cyber Ops: Criminal Investigators and Disruptors.

24.    The FBI's organizational chart shows that the "Cyber Division" of the FBI operates under the umbrella of the "Criminal, Cyber, Response and Services Branch"

along with the "Criminal Investigative Division," and the "International Operations Division." (Department of Justice | Federal Bureau of Investigation Organization Chart). Without any doubt, Defendants FBI and DOJ clandestinely pursued Plaintiff, acting as judge and jury in deciding that he was a criminal. To be sure, at least one FBI Cyber Operations team has tracked Plaintiff's online activity and has interfered or otherwise tampered with and intercepted Plaintiff's innocuous email transactions for years, wherever he goes. Defendants have a sordid history of such activities as will be shown in this Complaint.

25.    After stealing Plaintiff's computers from Panera Bread and meticulously scrutinizing files on his local drive and copying and then erasing files in his cloud drives for several months between November 26, 2022, and February 28, 2023, Defendants found no incriminating evidence of Plaintiff being a spy for the Red Chinese Government.

26.    Having grown even more desperate, Defendant FBI cyberstalked Plaintiff to his work location at the Ontario, California campus of the University of Phoenix. At 8:50 p.m. on the evening of March 1, 2023, Plaintiff discovered and took a cellphone photograph of the unique FBI Wi-Fi icon that read, "FBI Cyber Ops Tm 6[7]" as referenced above. (See Exhibit 3.) Again, such aggressive cyberstalking indicated that Defendants were convinced that Plaintiff was a criminal, spying for the Chinese.

///

**B.    Plaintiff's Panera Bread Precursor Encounter with FBI Agent.**

27.    Defendants had stalked Plaintiff to Panera Bread Cerritos before they stole his computers on November 26, 2022. They staked out this location when they became aware that it was one of his favorite hangouts for doing the work of grading papers and working on his books. One of Panera's managers acknowledged this fact.

28.    On Monday, November 28, 2022, two days after the theft, Panera Bread manager Dante, who was off work during the evening of the theft and to whom Sonya reports, left the following voicemail on Plaintiff's cell phone number ending in 6224:

29.    "Hi Firpo, this is Dante from Panera Bread. I was calling to talk to you about what happened on Saturday [November 26, 2022. First, I'd like to apologize. We've done something that we hope doesn't happen, and I know you typically feel safe in the cafe, so I do apologize about that situation. But we're trying to do what we can to help you. So, I just had a couple of questions regarding that night." This well-intended message reminded Plaintiff of the enormity of his loss, exacerbated by the knowledge that Dante's underling, Sonya, was very likely complicit.

30.    Dante's considerate message triggered a memory Plaintiff had of an earlier attempt to steal Plaintiff's property while he dined at Panera on September 26, 2022, two months to the day before the November 26, 2022, theft by an FBI Special Agent. Plaintiff left his equipment to go to the restroom as he had done before,. Upon returning, Plaintiff startled a man who had suddenly appeared and was hovering around Plaintiff's

computers. The man quickly smiled and then initiated a conversation, apparently to give the impression of normality. The stranger spoke with an accent that turned out to be Iranian. Being especially suspicious, given the strained relationship between the U.S. and Iran, Plaintiff decided to send the following email (again, dated September 26, 2022) to the FBI regarding the strange encounter and to other local and nearby law-enforcement agencies just in case the man was an undercover FBI agent:

31.     "Dear FBI, I met a man at Panera Bread in Cerritos, California identifying himself as an Iranian academic, who specializes in African American issues. Being impressed that he 'guessed' that I was an academic, I gave him my business card. Indeed, I am an African American Academic. With all of the turmoil happening in Iran, and given my extensive international travels, I thought it would be a good idea to forward his emails since meeting him could give the impression that I am somehow colluding with him. As a God-fearing man who was formally in law enforcement, as a civilian employee with the Los Angeles Police Department (LAPD), I greatly appreciate the efforts of the Federal Bureau of Investigation. Kind regards, Firpo Carr, PhD. P.S. The LAPD... and the Los Angeles County Sheriff's Department (LASD) are being copies on this communique. Panera Bread Cerritos falls under the jurisdiction of the LASD." (See Exhibit 4.)

32.     Reflectively and retrospectively, Plaintiff suspected that Defendant FBI had shared FISA warrant documentation with non-party Panera headquarters before an FBI

Special Agent's theft of his computers and other belongings on November 26, 2022.

Dante apparently was not privy to such information. However, the person to whom Dante

reported, General Manager Guillermo Flores, whom Plaintiff had never met, seemed to

have full knowledge of the FBI-Panera Bread connection. This fact, unwittingly, worked

in Plaintiff's favor insofar as FISA warrant documentation was concerned.

### C.    Non-Party Panera's Recorded Confession Implicating Defendant FBI in Connection with FISA Warrant Documentation.

33.    In response to Plaintiff's order to compel, served after a documents

subpoena was served but only partially fulfilled, non-party Panera confessed to

possessing FISA warrant documentation received from the FBI directly connecting

Defendant with the theft of Plaintiff's computers and related items on the evening of

Saturday, November 26, 2022. After consulting with Panera headquarters, General

Manager Guillermo Flores consented to being recorded. The transcript of the recorded

confession, contained in Plaintiff's declaration dated June 27, 2023 [**Mot. to Comp,
Decl, pars. 4-18, ECF 36**]., is presented herewith:

> *Plaintiff [Pre-written question]: "As specified in the subpoena, has Panera Bread*
>    *made available for Plaintiff—that would be me a copy of `all company*
>    *correspondents and documentation related to this matter?"'*
>
> *Manager: "Yes it's been sent to them already, so we just [crosstalk]"*
>
> *Plaintiff: ... [crosstalk] ... "or make a copy for me?" ...*

*Manager*: *"Yeah, they're going to make a copy for you."*

*Plaintiff*: *"Okay. You do realize that it was supposed to be ready today?"*

*Manager*: *"Yeah, I didn't really realize that. So, my apologies for that.*

*Plaintiff*: *"I see."*

*Manager*: *"But it's been, it's getting being done, so..."*

*Plaintiff*: *... [crosstalk] ... "How soon can I expect that?"*

*Manager*: *"Ah, once they respond to you, I can go ahead call you back, and then*

*get that ready for you, and they'll let me know when they'll give it to you."*

*Plaintiff*: *"Okay. Are we talking a month? a week?"*

*Manager*: *"No, no, no, no, no. It should be days, a couple of days, yeah."*

*Plaintiff* *"Okay. Alright then. Thank you very much."*

*Manager*: *"You're welcome."*

Although Manager said that I would receive the documentation in "a couple of days," [i]t has been well over a couple of months since our conversation, and I have not receive any documents.

In summary, I am asking the Court to compel Panera Bread to produce all documents that involve or mention me, the FBI, or the DOJ concerning the November 26, 2022, incident of the theft of items as plainly detailed in the subpoena. Panera promised to produce said documentation in "a couple of days" after April 14, 2023 but never did so.

**D.**      **Magistrate Judge Maria A. Audero Misled by Non-Party Panera Regarding FISA Warrant Documentation.**

34.      In its effort to hold on tenaciously to Defendant FBI's FISA warrant documentation, non-party Panera acted in bad faith when communicating with the Court as the following dialogue shows that occurred on July 18, 2023, during an Informal Discovery Conference called by Magistrate Judge Maria A. Audero in response to Plaintiff's Motion to Compel the Production of Documents.

> *Judge Audero: "Is it correct that you have not received that -- the documents yet?"*
>
> *Plaintiff: "That is correct. Yes, your Honor."*
>
> *Judge Audero: "Okay. Because as you are aware, based on my order I received an email from Panera saying, 'We've made arrangements to be compliant with the subpoena on this date.' But I think – I can't remember the exact date. But nevertheless – and, so, you know, 'Please take this informal discovery conference off the record.' So, that's why I'm asking – It sounded like they were going to be compliant, but it sounds like you're reporting to the Court that they have not produced the documents yet.*
>
> *Plaintiff: That is correct. ... No, the documents have not been forthcoming, your Honor.*

35.      Plaintiff has yet to receive the damning FISA documentation that Panera promised him and the Court. It has been several months since Panera was served the

---

subpoena, yet, after broken promises, deflection, and otherwise acting in bad faith,

Plaintiff is still not in possession of the incriminating documents.

## E.  Three Countries Spark FISA Warrant Justification.

36.    Of the over 80 lands that Plaintiff has traveled to conduct research, three are

standouts: China, the Soviet Union, and Cuba. In order of significance, these countries

have a capricious relationship with the U.S. and perhaps justifiably prompted red flags in

the FBI's system when Plaintiff visited them.

37.    China: After touring India to study Hinduism, Buddhism, Jainism, and

Sikhism firsthand, Plaintiff made one of his three trips to China for an up close and

personal look at Confucianism and Daoism. He had taught these Eastern religion

courses—as well as the Western religions of Judaism, Christianity, and Islam at the start

of his career as a university instructor in 1994.

38.    Given that tension between the U.S. and China has intensified in recent

years, the FBI capitalized on Plaintiff's trips there as an opportunity to frame him for

spying for the Chinese. This became evident in email exchanges between Plaintiff and

Dr. Don K. Nakayama, a fellow American College of Surgeons (ACS) member and

editor of *The American Surgeon*. Defendants, who have a history of doctoring emails and

intercepting mail coursing through the United States Postal Service, photoshopped Dr.

Nakayama's email photo to make him appear to be in the Red Chinese military. This

situation is expanded on below.

39.    <u>Soviet Union</u>: Moreover, after assisting the Soviets in modernizing the catalog at what was then called the Saltykov-Shchedrin State Public Library in Leningrad during his travel to the Soviet Union, January 1 – 14, 1989, the Soviets declared Plaintiff their "Honored Guest." They then allowed Plaintiff to take, for the first time, color photographs of pages from the world's oldest, most complete Hebrew Bible (Old Testament), the *Codex Leningrad B 19a*. This newsworthy event captured the attention of various news organizations, including the *Los Angeles Times* (August 4, 1990, "Southern California File," by John Dart, Religious Writer) and *Biblical Archaeology Review* (September/October 1992, Vol. 18, No. 5, "Firpo W. Carr Was First").

40.    <u>Cuba</u>: President Fidel Castro, who had a keen interest in education and cultural studies, arranged for Plaintiff to speak to the Cuban people on state-run national television after he discovered that Plaintiff had read and studied *Webster's Ninth New Collegiate Dictionary* in 1994 and subsequently documented the consistent thread of anti-Black racism in his book *Wicked Words: Minds Racism in the Dictionary* (1997).

41.    Plaintiff reiterates that while it is understandable that Defendants would flag Plaintiff as a person of interest because of travels to these countries, there is never a justification for infringing on Plaintiff's civil rights, FISA warrant or not.

42.    That Plaintiff traveled to China for academic research, to the Soviet Union to study biblical manuscripts, and to Cuba to analyze the socio-cultural dynamic when

juxtaposed with life in America was undoubtedly at the core of a FISA judge's decision to grant a FISA warrant wherein Plaintiff is the subject.

43.    However, Plaintiff is convinced that it was not the intent of the FISA judge to grant the FBI permission to break the law by stealing Plaintiff's cherished research contained in his computer files. More specifically, Plaintiff also feels that his visits to these countries notwithstanding, the FISA judge's decision does not give the FBI a license to find Plaintiff guilty of espionage against the United States of America, primarily provided that, until the present, the U.S. still permits travel to these destinations. In short, the FBI has conspired to injure Plaintiff, to procure him to be charged or arrested for espionage.

**F.  Plaintiff's Case Threatens Congressional FISA Reauthorization**

44.    Defendant FBI's egregious abuse and illegal use of the FISA warrant is at the heart of Plaintiff's complaint. Significantly, "Section 702 allows for the warrantless surveillance of foreign nationals outside the United States, even as they communicate with U.S. citizens on domestic soil. It's a feature that many fear allows intelligence agencies to keep tabs on U.S. citizens without securing a warrant [emphasis supplied]." (FISA 702 searches of foreign nationals tick up, amid major drop in US citizen queries | The Hill). [1]

---

[1] Plaintiff notes that while newspaper articles are generally considered "hearsay," such is not always the case. In other words, there are exceptions to the rule (*286 F23d 388 (5 Cir. 1961.*) "In a recent decision, the Court of Appeals for the Fifth Circuit held that an exception to this exclusionary rule will be made

45.     As clearly shown in the next section of this complaint, the FBI undeniably manipulated Plaintiff's email to make it seem that he was in communication with a "foreign national outside the Uni States," in this case a Chinese military officer (Dr. Don K. Nakayama mentioned above and discussed in more detail below), to allow them to keep tabs on Plaintiff, a U.S. citizen, "without securing a warrant." Defendants are growing more desperate as Congress weighs reauthorization of Section 702, given that FISA is set to expire this December 2023.

**(a)     Rampant FISA Abuses by Defendant FBI According FISA Court Chief Judge and Defendant DOJ.**

46.     Chief Judge James E. Boasberg, Presiding Judge, United States Foreign Intelligence Surveillance Court, wrote regarding Defendant DOJ: "Thanks in large part to the work of the Office of the Inspector General, U.S. Department of Justice, the Court has received notice of material misstatements and omissions in the [FISA] applications filed by the government." (See Exhibit 5).

47.     Defendant DOJ criticized Defendant FBI regarding a FISA abuse: "'In the rush to obtain and maintain FISA surveillance of Trump campaign associates, FBI officials misled the FISA court, omitted critical exculpatory facts from their filings, and suppressed or ignored information negating the reliability of their principal source,' the

where the evidence in question is necessary and the circumstances under which the declaration was made provide guarantees of trust worthiness. In *Dallas County v. Commercial Union Assur. Co.*"

attorney general said in his statement. 'The Inspector General found the explanations given for these actions unsatisfactory.' In a statement, FBI Director Christopher Wray said the FBI 'accepts the report's findings and embraces the need for thoughtful, meaningful remedial action. I have ordered more than 40 corrective steps to address the report's recommendations.'" (Internal Justice watchdog finds that Russia probe was justified, not biased against Trump (nbcnews.com)).

48.    Defendant DOJ further disparages Defendant FBI on the former's official website by candidly publishing:

49.    "Among the most important are the requirements in FBI policy that every FISA application must contain a 'full and accurate' presentation of the facts, and that agents must ensure that all factual statements in FISA applications are 'scrupulously accurate.' These are the standards for all FISA applications, regardless of the investigation's sensitivity, and it is incumbent upon the FBI to meet them in every application. The FBI fell far short of these standards in the applications targeting Carter Page, even though the FBI recognized that these applications would be subject to greater scrutiny than most FISA applications. In addition, we identified numerous instances of non-compliance with the FBI's factual accuracy review procedures (the 'Woods Procedures') in connection with the four Carter Page FISA applications." (Statement of Michael E. Horowitz Inspector General, U.S. Department of Justice before the U.S.

House of Representatives Committee on Appropriations Subcommittee on Crime and Federal Government Surveillance concerning "Fixing FISA: How a Law Designed to Pr.)

50.    As stated here, "The FBI fell far short of acceptable standards" with regard to FISA applications. Also, there were "numerous instances of non-compliance with the FBI's factual accuracy review procedures."

51.    It has also been documented that "The FBI exploited FISA to target 19,000 donors to the campaign of an unnamed candidate who challenged an incumbent member of Congress. An FBI analyst justified the warrantless searches by claiming 'the campaign was a target of foreign influence,' but even the Justice Department concluded that almost all those searches violated FISA rules. (In March, Rep. Darin LaHood (R-Ill.) revealed he had been wrongly targeted by the FBI in numerous FISA 702 searches — but he wasn't the challenger mentioned here.) The FBI also conducted secret searches of the emails and other data of 133 people arrested during the 2020 protests after George Floyd's killing. And the bureau conducted 656 warrantless searches to see if it could find any derogatory information on people it planned to use as informants." (The FBI just got caught in yet more massive, outrageous FISA abuses (nypost.com)).

52.    Plaintiff was disheartened to learn that in addition to him, Defendants FBI and DOJ have ravaged the lives and invaded the privacy of thousands of law-abiding American citizens.

///

**(b)    FBI Manipulates Email in Attempt to Frame Plaintiff as Spy for China.**

53.    Given that tension between the U.S. and China has intensified in recent years, the FBI capitalized on Plaintiff's trips there as an opportunity to frame him for spying for the Chinese. This became evident in email exchanges between Plaintiff and Dr. Don K. Nakayama, as briefly mentioned twice above, a fellow American College of Surgeons (ACS) member and editor of the journal The American Surgeon.

54.    On **December 13, 2022**, at 10:43 p.m., Plaintiff wrote the following email: "Dear Dr. Don K. Nakayama, I hope this email finds you well. I am hoping that you can send me a copy of the manuscript #ASU-22-0636 entitled `Surgeon Anxiety and Jehovah's Witnesses: Effective Intervention—A Pilot Study,' which I submitted to *The American Surgeon*. I am no longer in possession of the file since both my primary and backup laptops were stolen. Thank you for your time, sir. Kind regards, Firpo Carr, PhD."

55.    On **December 14a, 2022**, at 10:24 a.m. Plaintiff wrote the following email: "Dear Dr. Don K. Nakayama, I have received the manuscript that I requested. In her due diligence, Jessica sent it posthaste as per your direction. Thank you very much. Although I presented an updated, more robust version of the manuscript via a PowerPoint presentation at Clinical Congress 2022 this past October, it is beneficial to retain the original. Thank you again for your time and consideration, sir. Kind regards, Firpo."

56.     On **December 14b, 2022**, at 12:07 p.m., Plaintiff received the following email, allegedly from Dr. Don K. Nakayama: "Thank you. Remember there is a limit of four figures and tables. — DKN." The brief, nonsensical suspicious, email appears to be spoofed. The email profile photograph of Dr. Nakayama [see Exhibit 6], who is Japanese American [see Exhibit 7], appears to A be deep fake or photoshopped to make him appear to be a Communist Chinese military official wearing the traditional military hat.

57.     On **December 14c, 2022**, at 1:01 p.m., Plaintiff sent the following email to his alternate email address, firpocarr@firpocarr.com: "Someone has spoofed this reply email and photo of Japanese surgeon Dr. Don K. Nakayama to make him appear to be a member of the Communist Chinese government. This is an apparent attempt to tie me to the Chinese government. At [sic] it is, I have no ties whatsoever to either the Chinese government or to, any communist government, or any country or nation that the U.S. is an enemy."

58.     As far as Plaintiff knows, there is not now nor has there ever been an online photo of Dr. Nakayama in Communist Chinese military apparel. A stressed Plaintiff concluded that it is improbable that such a sophisticated stratagem to paint Dr. Nakayama as a Communist Chinese military official and tie him to Plaintiff would be employed by "a random homeless man" who is desirous of framing Plaintiff for espionage.

///

///

**(b)    Defendants' History of Illegally Accessing Mail and Emails.**

59.    Defendants have an abysmal record of unethical and illegal activity. It has been well documented that Defendants have overstepped their authority directly correlating to Plaintiff's case. It is especially bewildering when an FBI lawyer, an officer of the count, commits a crime in the course of their duties.

60.    Regarding the illegal act by an FBI lawyer in another court case, the *New York Times* (May 17, 2023) reports: "There were real-world flaws with the Russia investigation, especially how the F.B.I. botched applications to wiretap a former Trump campaign adviser. But the Justice Department's inspector general, Michael E. Horowitz, found those problems, leaving Mr. Durham with depleted hunting grounds. Indeed, credit for Mr. Durham's only courtroom success, a guilty plea by an F.B.I. lawyer who doctored an email during preparations for a wiretap renewal, belongs to Mr. Horowitz, who uncovered the misconduct [emphasis supplied]." (Analysis: Durham Report Failed to Deliver After Years of Political Hype -The New York Times (nytimes.com~).

61.    Another source states: "The former FBI lawyer who admitted to doctoring an email that other officials relied upon to justify secret surveillance of a former Trump campaign adviser was sentenced Friday to 12 months of probation, with no time behind bars. Prosecutors had asked that Kevin Clinesmith, 38, spend several months in prison for his crime, while Clinesmith's attorneys said probation would be more appropriate. Clinesmith pleaded guilty last summer to altering an email." (Ex-FBI lawyer Kevin

Clinesmith avoids prison after admitting he doctored email in investigation of Trump campaign - The Washington Post).

62.     Consistently, as shown, the FBI doctored Plaintiff's email for the nefarious purpose of painting him out as one committing espionage as a Chinese operative. Plaintiff proved that the FBI stalks him online cyberstalking and intercepts and manipulates his emails is clearly evidenced by the cell phone photo of their WIFI network, "FBI Cyber Ops Tm6[7]" that was entered as Exhibit 3 in his complaint.

63.     Unsurprisingly, in the days before emails, the FBI had a record of tampering with mail coursing through the United States Postal Service (USPS). According to the Church Committee, there was "an extensive and illegal mail-opening program run by the CIA and the FBI for more than two decades beginning in the mid-1950s." (A Brief History — FBI). The persistent illicit actions of the beleaguered FBI and DOJ should not be ignored relative to Plaintiff's case.

64.     Verifying the moral degradation within FBI ranks is the first-hand observations of a former special agent, as documented in Plaintiff's pleading:

"According to former Special Agent Nicole Parker, who testified before the House Select Subcommittee on the Weaponization of the Federal Government on this date and made the following statement: `The Bureau's mission should have remained the same, but its priorities and governing principles shifted dramatically. The FBI became politically weaponized starting from the top in Washington and trickling down to the

field offices,' including the Los Angeles field office. ([Hearing on the Weaponization of the Federal Government | House Judiciary Committee Republicans](#))."

65.    In this same venue, the report states: "Moreover, the Chair of the House Select Subcommittee on the Weaponization of the Federal Government, Representative Jim Jordan, at this same hearing declared: `In my time in Congress, I have never seen anything like this. Dozens and dozens of whistleblowers FBI agents coming us, talking about what's going on, the political nature at the Justice Department.'"

66.    Political overtones notwithstanding, the court should not dismiss this case because to do so would condone the illegal, unconscionable behavior of Defendants, the Federal Bureau of Investigation and the United States Department of Justice.

### G.    Plaintiff Attempts to Retrieved Emails Deleted by Defendant FBI.

67.    After the Plaintiff purchased a new laptop computer from Best Buy, 12118 Lakewood Blvd., Downey, California, on Sunday, **November 27, 2022**, the next day after the FBI theft. Having been an instructor at the University of Phoenix (UOPX) who has taught computer-related and other courses for nearly 30 years, Plaintiff attempted to access his two backup cloud drives (One Drive by the University of Phoenix and his personal Google Drive) in hopes of retrieving his files. Plaintiff reasoned that a random "homeless man" would be either satisfied or thrilled with the money he hoped to receive from the computers he stole and would neither likely have the know-how to reach files on

cloud drives nor have any use for said files. To Plaintiff's great disappointment, virtually all files going back years on these cloud drives had been deleted.

68.    The FBI obtained Plaintiff's passwords from his hard drives and deleted files, pictures, PowerPoint slides, and video presentations. Desperately hoping for a miracle to verify that he was not overlooking any files, Plaintiff contacted UOPX Faculty Technical Support in hopes of locating files in some nook and cranny in cyberspace. Disappointingly he was told that essentially all files had indeed been deleted, which was a highly unusual, deliberate act. Though crestfallen, this troubling information strengthened Plaintiff's suspicions that deleting his files in the backup cloud drives was nefarious. He surmised that this was not the work of a random, highly skilled technological whiz of a man living on the street. Moreover, no attempt was made to access Plaintiff's bank accounts or steal his identity. Instead, the perpetrators wanted to obtain Plaintiff's invaluable, innocuous information in his computer files and deny Plaintiff access.

69.    In the face of all odds, Plaintiff took an even deeper dive into where the files were, resting heavily on his substantive training over the decades. To bolster his confidence and escape depression, Plaintiff reminded himself that with a Ph.D. in computer information systems, a master's degree in management, and a bachelor's degree in information systems management, all acquired during his ten years (1979 —

1989) of employment with International Business Machines (IBM), he could find something that perhaps UOPX Technical Support may have missed.

70.    Furthermore, as clearer thinking repositioned the trauma that the FBI theft caused, Plaintiff began to gather himself as he revisited his qualifications. He mused that he worked as a civilian for the LAPD from 1994 — 2004, primarily as a Systems Analyst II, but also as an Assistant-Officer-in-Charge (AOIC) with the rank equivalency of sergeant.

71.    Plaintiff's reassessment led to a breakthrough. He was pleased to find the United States Patent and Trademark Office (USPTO) file correspondence and information related to his trademark issuance and patent application in a cloud drive that the FBI and UOPX Faculty Support missed. His excitement, however, as short-lived. When he attempted to open the files, he discovered that each one had been systematically corrupted sophisticatedly, as indicated by a small peach3 colored square in the lower left of the file icon, whether an Adobe in a Portable Document Format (.pdf or Microsoft Word file. Plaintiff took a photograph of the 6 screen displaying the files. To Plaintiff's consternation, these cloud drive files have since mysteriously disappeared, a feat that the FBI's cyber operations no doubt easily performed.

**H.    Chronological Details After FBI Conversion of Plaintiff's Property.**

72.    Starting with the act of conversion, the following chronological presentation is of a few instances when Plaintiff reported to various law-enforcement agencies that he

was being stalked, harassed, nearly run off the freeway, and other ways threatened by the FBI's illegal activities. These events paint a clearer picture of the ~ 6 circumstances surrounding the theft of Plaintiff's personal property:

73.    On Saturday, **November 26, 2022**, the FBI wrongfully took and withheld from Plaintiff's possession personal property in the form of computers and other articles, intending to permanently deprive Plaintiff of the benefit of said property as he dined at Panera Bread in Cerritos, California.

74.    On Sunday, **November 27, 2022**, the day after the theft, Plaintiff received the following text message on his Samsung A l0e (number ending in 26 6224): "Thanks for filing a stolen device claim with Assurant for your T-Mobile device." The stolen device was Plaintiffls Samsung A32-SG (number ending in 8440), which the FBI wrongfully took and withheld from Plaintiff's possession with the intention to permanently deprive Plaintiff the benefit of said property as he dined at Panera Bread in Cerritos, California.

75.    On Monday, **November 28, 2022a** (5:42 a.m.), Plaintiff received the following text message on his Samsung A l oe (number ending in 6224): "Assurant: Here's your tracking number for your replacement device shipped 11/27/2022." This necessary action was because the FBI wrongfully took and withheld from Plaintiff s possession his Samsung A32-SG number ending in 8440 with the intention to permanently deprive Plaintiff of the benefit and use of this cell phone.

76.     On Monday, **November 28, 2022b,** Plaintiff purchased anew computer laptop from Best Buy (00008722), Lakewood Blvd., Downey, California in the amount of $663.99 because the FBI wrongfully took and withheld from Plaintiff's Microsoft Surface Pro 4 tablet computer possession with the intention to permanently deprive Plaintiff the benefit of said tablet computer.

77.     On Monday, **November 28, 2022c,** Detective Aguirre of the LASD Cerritos station told Plaintiff that a detective was sent to Panera Bread to view the video of larceny being committed as the undercover FBI agent stole Plaintiff's computer items on November 26, 2022. The reality of the actual existence of this hard evidence stressed Plaintiff out even more.

78.     On Tuesday, **November 29, 2022,** Plaintiff received his replacement cell phone, a Samsung A32-SG, with the number ending in 8440. This replacement cell phone was necessary because the FBI wrongfully took and withheld from Plaintiff his original cell phone, intending to permanently deprive Plaintiff of the benefit of its usage.

79.     On Wednesday, **December 7, 2022,** Plaintiff was in Murietta, California, to teach a class at the University of Phoenix Learning Center when he saw a man fitting the description of the undercover FBI agent (Agent A for this date entry) described by the Panera Bread server. Given that an FBI cyber ops team had stalked Plaintiff to the University of Phoenix Learning Center in Ontario, California, it was not a stretch to conclude that they would following him to the Murietta Center.

80.     Agent A appeared at the Shell gas station off the Murietta Hot Springs exit of the freeway, where Plaintiff was getting gas before class. Agent A, with an empty gas container in hand, approached Plaintiff, pretending that he was low on gas, and was unsure if he and his "girlfriend" sitting in the passenger side front seat (another FBI agent, Agent B) would make it to San Diego to get her car. After exchanging greeting pleasantries,

81.     Agent A asked Plaintiff if Plaintiff could loan him some money for gas. Plaintiff responded that he would rather pay directly for the gas with his debit card. Plaintiff, who suspected Agent A was indeed an FBI agent, had filled his own tank and volunteered to pump Agent A's gas. Plaintiff then asked Agent A how much gas it takes to fill the tank. This simple question stumped Agent A, who needed to determine the answer. Befuddled, Agent A asked his "girlfriend" partner, Agent B, who confidently answered, "65 dollars." It struck Plaintiff as odd that Agent B knew precisely how much it took to fill the car, even though it was not hers. Plaintiff's LAPD detective training informed him of suspicious activity.

82.     Agent B now emerged from the passenger side with a box of jewelry in her hand and gave Plaintiff the option to select any two that he desired to thank him for his generosity, saying that it would be a nice gift for Plaintiffs "wife or girlfriend." This kind gesture of gratitude alerted Plaintiff that these were indeed FBI agents. After declining the offer, it occurred to Plaintiff that Agent B just said, "wife or girlfriend."

83.    Plaintiff's training as a psychologist, as well as his detective training, caused his to ponder, "Why didn't she include daughter, granddaughter, mother, sister, or other female relative? How does she know that I am not gay, and don't have a female significant other?" Plaintiff knew the answers to these questions. He was acutely aware that the FBI knew that his mother was deceased, he was estranged from his daughter, granddaughter, and sisters, and that was a Christian minister, he was neither gay nor bisexual. These two agents disguised themselves at the Shell station, intending to hinder Plaintiff's enjoyment of peace and privacy.

84.    On Thursday, **December 8, 2022**: Stressed and desperate, Plaintiff discovered corrupted files after taking a deeper dive into one of his cloud drives. This clearly showed that these filets were purposefully, deliberately, and strategically corrupted. This act was further confirmation that the FBI wrongfully i ~ took and withheld from Plaintiff's possession his computer files with the intention to deprive Plaintiff of the benefit of these files permanently.

85.    On Tuesday, **December 13, 2022**: Plaintiff emails Dr. Don K. Nakayama, editor of The American Surgeon and a fellow member American College of Surgeons, requesting a copy of the manuscript he submitted since the original was on one of Plaintiff's computers that the FBI wrongfully took and withheld from Plaintiff's possession intending to permanently deprive Plaintiff the benefit of having the file on the

stolen computer. The FBI conspired to oppress Plaintiff by denying him the opportunity to be published.

86.     On Wednesday, **December 14a, 2022**: Plaintiff sent Nakayama a grateful email acknowledging receipt of the manuscript file, unaware that the FBI was conspiring to injure Plaintiff to procure him to be charged or arrested for espionage.

87.     On Thursday, **December 14b, 2022**, Plaintiff received a bogus email from the FBI pretending to be Nakayama, with Nakayama (who is Japanese American) dressed in Communist Chinese military attire, unaware that the FBI was conspiring to injure Plaintiff, to procure him to be charged or arrested for espionage.

88.     On Friday, **December 14c, 2022**, Plaintiff forwarded a copy of said incriminating email to his alternate email address, fearing that the FBI's cyber operations unit might delete it. This unit had already hijacked Plaintiff's Gmail account several times, forcing Plaintiff to recover it repeatedly. Already struggling emotionally under the duress of having the FBI steal his items, Plaintiff felt that the FBI's intervention in emails between him and Nakayama was one of the more egregious acts to sabotage Plaintiff's career. All the while, Plaintiff was unaware that the FBI was conspiring to injure Plaintiff to procure him to be charged or arrested for espionage.

89.     On Thursday, **December 15, 2022**, Plaintiff filed a complaint with the DOJ Office of Professional Responsibility and received a submission acknowledgment. Plaintiff had reason to be downcast given that since a FISA warrant is involved, the DOJ

Office of Professional Responsibility would pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant arrangement.

90.    On Tuesday, **January 3a, 2023**, Plaintiff called the Department of Justice Office of the Inspector General Investigative Division three times on the 6 morning of Tuesday, January 3, 2023 (7:36 am, 7:43 am, and 8:17 am, all Pacific Standard Time). There was no answer the first time. It rang several times until it switched to a busy signal. Someone answered but was silent before they disconnected the second time. And, like the first time, there was no answer the third time. Plaintiff was convinced that the Department of Justice Office of the Inspector General Investigative Division was doubling down on their conspiracy to Pervert or obstruct justice or the due administration of the laws in an effort to 16 preserve the FISA warrant process.

91.    On Tuesday, **January 3b, 2023**, at 8:30 a.m., Plaintiff submitted an 1 9 official complaint to the U.S. Department of Justice Office of the Inspector 20 General at 8:29 a.m. [See Exhibit 12]. In Plaintiff s words, submitting a complaint 21 22 to the Department of Justice was tantamount to the "fox guarding the henhouse." 2~ Plaintiff was sure that the Department of Justice Office of the Inspector General 24 25 was bolstering its position to conspire to pervert or obstruct justice or the due 26 administration of the laws in an effort to preserve the FISA warrant process.

92.    On Tuesday, **January 6, 2023**, Plaintiff called the Department of Justice and creatively reached an employee ("Cheryl"). After Plaintiff explained to a startled Cheryl

how he managed to get her, he related that he was attempting to call someone in the OIG's Investigative Division but that the lines were not working correctly. Cheryl nervously stated that it was not her section but that he was trying to connect with, but that she would transfer Plaintiff to "Anthony." Plaintiff repeated to Anthony how he reached him, after which Anthony apologized for the lines not working and said he would report that the main number was inoperative. After consulting his supervisor, Anthony provided Plaintiff with two alternative telephone numbers for the OIG Investigative Division. Plaintiff perceived these tactics as part of the conspiracy to pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant process.

91.     On Thursday, **January 12, 2023**, Plaintiff called the main telephone number for the OIG Investigative Division and spoke with a person identifying herself as Operator 6. When Plaintiff asked her approximately how long it would take for his complaint to be addressed, she stated that there was no time frame, and neither was there a way to expedite the process. Plaintiff expressed his disappointment and hoped to be still alive if and when they got around to his complaint because he had good reason to believe that the FBI had bugged his cell phones. He shared that since he submitted the complaint, numerous suspicious cars, with high-intensity bright headlights, have been following him, and that any and everywhere he went—whether to the grocery store, gym, or cafe shop—some suspicious characters) invariably showed up, some with a white earpiece in many cases. Plaintiff surmised that he was being put off by Operator 6 as part of the

conspiracy to pervert or obstruct justice or the due administration of the laws in an effort to preserve the FISA warrant process. The FBI stalked Plaintiff with the intention to harass him by aggressively surveilling him, causing Plaintiff distress and fearing for his life and safety.

92.    On Tuesday, **January 24, 2023**, Plaintiff called the LASD station in Cerritos, California, to inquire about the investigation of his items stolen from Panera Bread and spoke with Detective Aguirre. According to Detective Aguirre, a 16 detective was sent to Panera Bread to view the video of the crime, which clearly showed Plaintiff's items being stolen on November 26, 2022. Regrettably, for nearly two months, no one from the Sheriff's Department ever contacted Plaintiff. Moreover, Detective Aguirre told Plaintiff that the case was open indefinitely. Plaintiff believes that the stalling on the part of Detective Aguirre was inspired by the FBI and is part of the conspiracy to pervert or obstruct justice or the due administration of the laws.

## V.  FIRST CAUSE OF ACTION VIOLATION OF THE UNITED STATES CONSITUTION (BIVENS CLAIM) (Against All Defendants)

93.    Plaintiff incorporates by this reference the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint.

94.    Due to DR. CARR having traveled to Communist Red China, the Soviet Union, Cuba, the Defendant FBI stole Plaintiff's computers in hopes of finding files that

would incriminate him as a spy for the Red Chinese government. Defendants ruthlessly cyberstalked and gang stalked Plaintiff and terrorized him in the process.

95.     Given that unnamed FBI Special Agents were working under the authority of FISA warrant, they acted within the scope of their employment and with the consent and knowledge of the United States government, the DOJ, and USAO.

96.     The acts and conduct of the Defendants as alleged above constitute a violation of Plaintiffs Fourth Amendment rights under the United States Constitution, and said Defendants are liable for Plaintiff's injuries and damages herein described. Specifically, abusing their authority to operate under the authority granted them under a FISA, Defendant FBI seized personal, academic, business, and professional computer files, which constitutes a violation of his right to be free from unreasonable and unlawful seizure under the Fourth Amendment.

97.     In depriving Plaintiff of his rights under the United States Constitution and under the laws of the State of California, the Defendants demonstrate malice, oppression, and a willful disregard for the rights of Plaintiff. Defendants exhibited a reckless indifference and wanton disregard for Plaintiff's rights and as a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages, loss opportunities for submitting research papers and receiving speaking assignments at conferences sponsored by the APA, AMA, and ACS, and is entitled to recover compensatory and punitive damages, as well as Court costs.

## VI. SECOND CAUSE OF ACTION DEPRIVATION OF LIBERTY AND PROPERTY INTEREST IN FUTURE EMPLOYMENT (BIVENS CLAIM)

### (Against All Defendants)

98.    Plaintiff incorporates by reference the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint.

99.    On November 26, 2022, due to Defendant FBI theft of DR. CARR's computers with an address book with academic and business contacts from around the world and files of unfinished books or books in the process of being revised Defendants violated DR. CARR'S Fifth Amendment rights to liberty and property under the Due Process Clause and DR. CARR was injured in respect to his position as president and CEO of Scholar Technological Institute of Research, Inc., his profession as a university instructor, and his prospects as a lecturer at various professional conference and events.

100.    Since the publishing of the present complaint by DR. CARR on March 10, 2023, readily appears during a Google search, educational institutions and colleagues have shunned him, given the perceived respectability and of the FBI and DOJ. Hence, without knowing the facts of the case, especially given that collectively all Defendants are seen as the United States of America, DR. CARR's reputation is ruined as a legitimate scholar with worldwide recognition.

101.    Subsequent to the conversion of DR. CARR's computers by Defendant FBI, and subsequent to Plaintiff filing this complaint, Defendants' counsel, AUSA Jill S.

Casselman, called or label DR. CARR, who is a well-respected psychologist, "delusional" in the public record. Consequently, stemming from the initial conversion, his reputation is further damaged given the weight of her title, because this allegation called into question the integrity and reliability of DR. CARR's qualifications.

102.    In depriving DR. CARR of his Fifth Amendment rights to liberty and property in employment, the Defendants have demonstrated malice, oppression, and a willful disregard for the rights of DR. CARR. Defendants exhibited a reckless indifference and wanton disregard for DR/ CARR and have harmed DR/ CARR by instigating the above-described events.

## VII.  THIRD CAUSE OF ACTION CONSPIRACY TO VIOLATE UNITED STATES CONSTITUTION (BIVENS CLAIM) (Against All Defendants)

103.    Plaintiff incorporates by reference the preceding allegations of this complaint and the allegations set forth in the remainder of the complaint.

104.    Beginning in or about November 22, 2022, and continuing to the date of this Complaint, Defendants FBI, DOJ, and DOES 1-10, persons whose exact identities and roles are not presently precisely known to Plaintiff, conspired, confederated, and agreed together and with others to violate the rights of Plaintiff DR. CARR as guaranteed to him under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. DR. CARR will seek leave to amend this Complaint to include the names, offices, duties,

and roles of those conspirators named herein as DOES 1-10 when, and as discovery

discloses the identities and roles of the conspirators.

105.    The constitutional rights of DR. CARR which were violated by the conduct

of the conspirators includes, but is not limited to: (1) his right to be free from

unreasonable search and seizure under the Fourth Amendment; (2) his right to the

peaceful and useful enjoyment of his property rights in his various professions such as

university instructor, health psychologist, company CEO, and Bible scholar, under the

Fifth and Fourteenth Amendments; (3) his right to the exclusive and undisturbed

possession of his personal property, including all his computer files with proprietary

information, under the Fifth and Fourteenth Amendment; and (4) his right to enjoy an

unsullied personal and professional reputation, free from unfounded and spurious

allegations of personal and professional misconduct under the Fifth and Fourteenth

Amendments.

106.    The objects of the conspiracy are as follows:

(a)    Defendants conspired with non-party Panera to hide the identify of

Defendant FBI, who stole Plaintiff computers and related items and equipment, from

Plaintiff.

107.    In furtherance of the conspiracy to violate DR. CARR'S constitutional

rights, Defendants performed, among others, the following overt act in their individual

capacities to accomplish the objects of the conspiracy:

(a)    Defendants conspired with non-party Panera to hide the identify of Defendant FBI, who stole Plaintiff computers and related items and equipment, from the Court, specifically Magistrate Judge Mria Audero by influencing Panera to withhold damning FISA warrant documentation.

108.   The foregoing overt acts are part of a single ongoing effort to harm and punish DR. CARR for no good cause and to further violate DR. CARR's constitutional rights to be free from unreasonable search and seizure, and to have undisturbed use and possession of his personal property and to have and enjoy the fruits of his professional endeavors and notable accomplishments and unblemished reputation.

109.   DR. CARR is therefore entitled to an award of compensatory and punitive damages.

## VIII.  FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FTCA CLAIM)

### (Against all Defendants)

110.   Plaintiff incorporates by reference Paragraphs 1 through 53.

111.   Defendants' bold theft of his computers and related item was shocking and outrageous to the degree that it caused DR. CARR severe emotional distress.

112.   At all times herein mentioned, Defendant's agents were acting within the course and scope of their employment, in their official capacity, for the FBI and DOJ.

113.   DR. CARR suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body as the proximate result of the aforementioned acts. As a further proximate cause of the aforementioned acts, DR. CARR, a Health Psychologist, has found it necessary to employ various self-care techniques since he does not subscribe to Allopathic, Biomedicine, or Conventional medicine, but has determined the comparable costs.

114.   The conduct of Defendant FBI Special Agents was intentional and malicious and done for the purpose of causing DR. CARR to suffer humiliation, mental anguish, and emotional and physical distress. The conduct of Defendant's agents was done with the knowledge that DR. CARR's emotional and physical distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to DR. CARR.

115.   Under the Federal Tort Claims Act, Defendants, including the United States of America, are liable for the actions set forth above which were committed by Defendants while under the scope and authority of their offices and employment.

116.   DR. CARR is therefore entitled to an award of compensatory and punitive damages.

## IX.  FIFTH CAUSE OF ACTION NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (FTCA CLAIM) (Against all Defendants)

117.   Plaintiff incorporates by reference Paragraphs 1 through 53.

118.   The conduct of Defendants and their agents who stole DR. CARR's computers was shocking and outrageous to the degree that it caused DR. CARR severe emotional distress.

119.   The Defendants were negligent in failing to effectively supervise Defendant unnamed FBI Special Agents by failing to monitor the course of their surveillance of DR. CARR's movements and actions so as to prevent the theft of Plaintiff's computers.

120.   At all times herein mentioned, Defendants were acting within the course and scope of their employment, in their official capacity, for the FBI and DOJ.

121.   As the proximate result of the aforementioned acts, DR. CARR suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body as the proximate result of the aforementioned acts. As a further proximate cause of the aforementioned acts, DR. CARR, a Health Psychologist, has found it necessary to employ various self-care techniques since he does not subscribe to Allopathic, Biomedicine, or Conventional medicine, but has determined the comparable costs.

122.   Under the Federal Tort Claims Act, defendants, including the United States of America, are liable for the actions set forth above which were committed by Defendants while under the scope and authority of their offices and employment.

123.   DR. CARR is therefore entitled to an award of compensatory and punitive damages.

## X.  SIXTH CAUSE OF ACTION CONVERSION (FTCA CLAIM)

## (Against all Defendants)

124.   Plaintiff incorporates by reference Paragraphs 1 through 53.

125.   Defendant FBI is guilty of stealing Plaintiff's computers and related equipment.

126.   At all times mentioned, unnamed Special Agent Defendants of the FBI were acting within the course and scope of their employment, in their official capacity. The FISA warrant documentation in the possession of non-party Panera is evidence that said FBI Special Agents were on duty at all times during the theft.

127.   At all times mentioned, unnamed Defendant FBI Special Agents were acting within the course and scope of thier employment, in their official capacity, for DOJ. DR. CARR suffered discomfort and annoyance and experienced mental suffering caused by the fear of prosecution after being framed as a Chinese spy by the FBI without any ability to exonerate the claims against him as a proximate result of the unauthorized taking of DR. CARR's computers and associated items.

128.   The aforementioned acts of Defendants were willful and malicious in that Defendants took DR. CARR's computers and other items and continue to retain it, and DR. CARR is therefore entitled to compensatory and punitive damages.

129.   Under the Federal Tort Claims Act, defendants, including the United States of America, are liable for these actions which were taken under color of federal authority.

130.   DR. CARR is therefore entitled to an award for compensatory damages.

## XI.  SEVENTH CAUSE OF ACTION NEGLIGENCE (FTCA CLAIM)

### (Against All Defendants)

131.   Plaintiff incorporates by reference Paragraphs 1 through 53.

132.   Defendants owed a duty to Plaintiff and, as described above, breached their duty to Plaintiff due to the negligent hiring and retention of Defendants named above, and, as such, were a direct and proximate cause and a substantial factor in bringing about Plaintiff's damages outlined above.

133.   The actions of Defendants constitute the tort of negligence under the laws of California.

134.   The at all times mentioned herein, Defendants FBI, were acting within their official capacity, within the course and scope of their employment.

135.   Under the Federal Tort Claims Act, Defendants, including the United States of America, are liable for these actions.

136.   The aforementioned Defendants owed a duty of care to DR. CARR and their negligence was a direct and proximate cause as well as a substantial factor in bringing about the harm DR. CARR has suffered; thus, entitling him to compensatory and punitive damages.

137.   Under the Federal Tort Claims Act, defendants, including the United States of America, are liable for any negligent or wrongful act or omission of any employee of the Government.

138.   DR. CARR is therefore entitled to an award for compensatory damages.

## XII. EIGHTH CAUSE OF ACTION INVASION OF PRIVACY (FTCA CLAIM)

### (Against all Defendants)

139.   Plaintiff incorporates by reference Paragraphs 1 through 53.

140.   Defendants invaded DR. CARR's privacy when they accessed his computer files on his local drives and thereafter accessed confidential files on his cloud drives and denied Plaintiff to all this files. The illegal confiscation of this computers with Word documents, audio and video files was intentional and malicious with the purpose of proving DR. CARR was spying for Communist Red China causing him to suffer humiliation, mental anguish, and emotional and physical distress.

141.   At all times mentioned herein, Defendants were acting within their official capacity, within the course and scope of their employment for the FBI and DOJ.

142.   Under the Federal Tort Claims Act, defendants, including the United States of America, are liable for the invasion of privacy, which occurred under color of federal authority.

143. DR. CARR is therefore entitled to an award of compensatory damages.

///

### *JURY DEMAND*

144.    Pursuant to F.R.C.P. 38, Plaintiff hereby demands a trial by jury on all claims and counts so triable by right.

### *PRAYER*

WHEREFORE, Plaintiff prays for judgment against Defendants, and all of them as follows:

(a)    To enter judgment in favor of Plaintiff against Defendants, finding the acts of Defendants complained of herein in violation of the Fourth and Fifth Amendments of the United States Constitution and in violation of California Law.

(b)    To enter judgment in favor of Plaintiff against Defendants and to remove from their positions as government officers those Defendants found to have engaged in any of the illegal practices charged in the instant complaint.

(c)    To enter judgment in favor of Plaintiff against Defendants jointly and severally for compensatory damages based upon Plaintiff's emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life in the amount of $10,000,000.

(d)    To enter judgment in favor of Plaintiff against Defendants jointly and severally for special damages in an amount subject to proof at trial.

(e) To enter judgment in favor of Plaintiff against Defendants and order Defendants to pay damages to Plaintiff and all attorney's fees and costs incurred herein and for interest on any damage award at the legal rate.

(f) To grant all other such relief as law and justice may require and may be appropriate.

Dated: August 28, 2023

/s/ Firpo Wycoff Carr

Firpo Wycoff Carr

In Pro Se

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1



**Exhibit 1: Dr. Carr and former President Bill Clinton.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Exhibit 2: Dr. Carr and former Florida Governor Jeb Bush.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3



**Exhibit 3: FBI Wi-Fi Icon**

**EXHIBIT 4**

**Exhibit 4: Plaintiff email to FBI**

"Dear FBI, I met a man at Panera Bread in Cerritos, California identifying himself as an Iranian academic, who specializes in African American issues. Being impressed that the "guessed" that I was an academic, I gave him my business card. Indeed, I am an African American Academic. With all of the turmoil happening in Iran, and given my extensive international travels, I thought it would be a good idea to forward his emails since meeting him could give the impression that I am somehow colluding with him. As a God-fearing man who was formally in law enforcement, as a civilian employee with the Los Angeles Police Department (LAPD), I greatly appreciate the efforts of the Federal Bureau of Investigation. Kind regards, Firpo Carr, PhD. P.S. The LAPD... and the Los Angeles County Sheriff's Department (LASD) are being copied on this communique. Panera Bread Cerritos falls under the jurisdiction of the LASD." (Date: September 26, 2022. Time: 9:21 a.m.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 5**

Unclassified
~~SECRET//NOFORN~~

Filed
United States Foreign
Intelligence Surveillance Court

JAN 0 7 2020

LeeAnn Flynn Hall, Clerk of Court

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.

| | |
|---|---|
| IN RE CARTER W. PAGE, | Docket Nos: 16-1182, 17-52, 17-375, |
| A U.S. PERSON | 17-679 |

ORDER REGARDING HANDLING AND DISPOSITION OF INFORMATION

Thanks in large part to the work of the Office of the Inspector General, U.S. Department of Justice, the Court has received notice of material misstatements and omissions in the applications filed by the government in the above-captioned dockets. *See* Docket No. Misc. 19-02, Order (Dec. 17, 2019; DOJ OIG, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019 (revised)). DOJ assesses that with respect to the applications in Docket Numbers 17-375 and 17-679, "if not earlier, there was insufficient predication to establish probable cause to believe that [Carter] Page was acting as an agent of a foreign power." *Additional Rule 13(a) letter regarding applications submitted to the Court targeting Carter W. Page in Docket Numbers 2016-1182, 2017-0052, 2017-0375, and 2017-0679* (Dec. 9, 2019), at 19 ("December 9, 2019 Letter").

The government further reports that the FBI has agreed "to sequester all collection the FBI acquired pursuant to the Court's authorizations in the above-listed four docket numbers targeting [Carter] Page pending further review of the OIG Report and the outcome of related investigations and any litigation." *Id.* at 19-20. The government has not described what steps are involved in such sequestration or when it will be completed. It has, however, undertaken to "provide an update to the Court when the FBI completes the sequestration" and to "update the Court on the disposition of the sequestered collection at the conclusion of related investigations and any litigation." *Id.* at 20. To date, no such update has been received.

The Court understands the government to have concluded, in view of the material misstatements and omissions, that the Court's authorizations in Docket Numbers 17-375 and 17-679 were not valid. The government apparently does not take a position on the validity of the authorizations in Docket Numbers 16-1182 and 17-52, but intends to sequester information acquired pursuant to those dockets in the same manner as information acquired pursuant to the subsequent dockets.

Title I of the Foreign Intelligence Surveillance Act, codified as amended at 50 U.S.C. §§ 1801-1813, governs electronic surveillance conducted for foreign intelligence purposes. It requires minimization procedures "that are reasonably designed . . . to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning

~~SECRET//NOFORN~~
Unclassified

Page 1

## Exhibit 5: FISC Order; Page 1 of 2

Unclassified

SECRET//NOFORN

unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information." 50 U.S.C. § 1801(h)(1). It also makes it a crime to "intentionally . . . disclose[ ] or use[ ] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by FISA or another "express statutory authorization." § 1809(a)(2).

In order for the Court to assess whether the handling and disposition of the information acquired pursuant to the above-captioned dockets comport with these provisions of FISA, IT IS HEREBY ORDERED as follows:

1. By January 28, 2020, the government shall make a written submission regarding the FBI's handling of information obtained pursuant to the above-captioned dockets. That submission shall include:

a. a detailed description of the steps taken or to be taken to restrict access to such information in unminimized form, including how many personnel have access and for what purposes they may examine or retrieve it;
b. a detailed description of the steps taken or to be taken to restrict access to such information in any other form, including any information that may have been disclosed or disseminated to DOJ prosecutors or other persons outside of the FBI;
c. to the extent applicable, a timetable for completing any such steps that have not yet been completed;
d. explanations of the "further review of the OIG Report" and "related investigations and any litigation" that are referenced in the December 9, 2019, Letter as requiring the retention of such information, including copies of any orders of other courts relating to the preservation of, or access to, such information; and
e. an explanation of why the retention of such information in the manner intended by the government, and any contemplated use or disclosure of it, comport with the above-referenced provisions of FISA; and

2. In order to facilitate consideration of whether the Court should publish this Order pursuant to FISC Rule of Procedure 62(a), the government shall, by January 21, 2020, complete a declassification review of this order and submit to the Court a copy of such order with any redactions it would propose in the event of publication.

ENTERED this 7ᵗ day of January 2020.

159

JAMES E. BOASBERG
Presiding Judge, United States
Foreign Intelligence Surveillance Court

I, Denise ___, ___ ___ ___ ___ ___ ___ ___
FISC, certify that this document is a true
and correct copy of the original.

SECRET//NOFORN                    Page 2

Unclassified

**EXHIBITS 6 & 7**



**Exhibit 6: A spoofed email photo of Dr. Don K. Nakayama.**



**Exhibit 7: An authentic photo of Dr. Don K. Nakayama.**

**ATTACHMENT: Clerical corrections for First Amended Complaint**

The Honorable Judge Otis D. Wright, II

Case No.:    2:23-cv-01813-ODW-MAA

Case nae:    Dr. Firpo Wycoff Carr, PhD v. Federal Bureau of Investigation and
United States Department of of Justice.

Author:    Firpo Wycoff Carr, in Pro Se


Corrections:

| | | |
|---|---|---|
| 1. | "AMENDED" (hand printed, removed) | page 1, line 11 |
| 2. | "UNITED STATES OF AMERICA" (added) | page 1, line 14 |
| 3. | "(AMENDED)" (typed, added) | page 1, line 15 |
| 4. | "VII" (added) THIRD CAUSE… | page 40, line 13 |
| 5. | "VIII" (added) FOURTH CAUSE … | page 42, line 16 |
| 6. | "IX" (added) FIFTH CAUSE … | page 43, line 23 |
| 7. | "X" (added) SIXTH CAUSE … | page 45, line 1 |
| 8. | "XI" (added) SEVENTH CAUSE … | page 46, line 2 |
| 9. | "XII" (added) EIGHT CAUSE … | page 47, line 6 |
| 10. | "GUZMAN" removed "DR. CARR" (added) | page 47, line 26 |
| 11. | "///" (added) | page 47, line 28 |
| 12. | "JURY DEMAND" (moved to next page) | page 47, line 28 (was) Page 48, line 1 (now) |